GRANDVIEW MINES, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 63026.    Filed June 18, 1959.

*Allan H. Toole, Esq.*, and *Joseph Nappi, Esq.*, for the petitioner.
*George E. Constable, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in petitioner's
income taxes and petitioner asserts overpayments in the years and
amounts as follows:

| Year | Deficiency | Overpayment |
|------|-----------|-------------|
| 1950 | $55,928.82 | $5,220.42 |
| 1951 | 68,985.30 | 11,981.86 |
| 1952 | 71,594.66 | --------- |
| 1953 | 807.59 | --------- |

The issues are:

1. Whether petitioner's depletion computation should have been
based on a percentage of gross income or net income from the
property;

2. Whether the payment of $18,957.20 to the American Zinc, Lead
and Smelting Company in the year 1951 was deductible as an ordinary
and necessary business expense; and

3. Whether petitioner was entitled to deduct an exempt excess
output credit in determining excess profits net income.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as
stipulated.

Petitioner, Grandview Mines (hereinafter referred to as Grand-
view), is a corporation organized under the laws of the State of

Washington on September 13, 1927, and has its principal place of business in Spokane, Washington. It filed corporation income tax returns on an accrual basis for the calendar years 1950 and 1951 with the collector of internal revenue at Spokane, Washington, and for the calendar years 1952 and 1953 with the director of internal revenue at Tacoma, Washington.

Prior to and during the years in question, Grandview owned mining equipment, a concentrating plant, and mining claims containing principally lead and zinc and commonly known as the Grandview properties. These properties were located in the Metaline Falls Mining District, Pend Oreille County, Washington. On June 5, 1936, Grandview entered into an agreement with American Zinc, Lead and Smelting Company (hereinafter referred to as American), a corporation organized under the laws of the State of Maine and having its principal place of business at St. Louis, Missouri, for the development of the Grandview properties.

The agreement provided, in part, as follows:

1. Hereby gives and grants unto the purchaser, an option to purchase said concentrating plant of the vendor, consisting of the crude ore building, crushing plant, conveyor shed, crushed ore bin and mill with all tools, machinery and equipment located thereon, or used in connection therewith, and the dwellings adjacent thereto, and any other building or thing of any kind or nature now constituting a part of said concentrating plant, whether herein expressly mentioned or not, and together with so much of the surface of the land upon which the buildings and equipment are located as may be reasonably necessary or convenient in the operation thereof, and also the power lines and water line from the power house of the Lehigh Portland Cement Company on Sullivan Creek to the said concentrating plant, but excluding all mining buildings and mining equipment, such as compressor house and equipment, engine room and equipment, blacksmith shop and equipment, change house and equipment, powder house and equipment, and all other miscellaneous buildings and equipment used only in connection with the excavation and transportation of ore from the mine.

2. The purchase price of said concentrating plant shall be the sum of Fifty thousand ($50,000.00) Dollars, payable in monthly installments on the following basis, and at the following rate:

For all concentrates produced in the mill above referred to, regardless of where the ores treated shall be mined, the purchaser shall pay the sum of One and no/100 ($1.00) Dollar per ton of concentrates produced, settlement to be made on or before the tenth (10th) day of each month for ores milled the preceding month.

   *       *       *       *       *       *       *

8. This option for the purchase of said concentrating plant may be exercised by the purchaser at any time prior to the 5th day of June, 1938, by the purchaser's mailing to or personally delivering to, the vendor, at Spokane, Washington, written notice of its election to exercise this option, and upon the mailing or serving of such notice of election, the terms hereof shall govern the further carrying out of this agreement.

9. As a further consideration of this option and agreement, the purchaser shall have the right, at any and all times during the term of this option and agreement, to mine and extract ore from any and all of the mining properties belonging to the vendor, now constituting the Grandview group, and any other properties now or hereafter belonging to the vendor, situated in the immediate vicinity, to the extent of the amount of any feasible tonnage when such ore can be mined at a profit to the purchaser of not less than One and no/100 ($1.00) Dollar per rock ton. In the event that the purchaser shall mine and extract the crude ore from said properties of the vendor, said ore shall be concentrated at the mill herein referred to, and the purchaser shall pay therefor to the vendor from the net smelter returns of the concentrates produced therefrom, the following royalties:

On zinc concentrates when the smelter price at East St. Louis is under 4 cents per lb. 5%

| 4.01 to 4.5 cents per lb | 6% |
|---|---|
| 4.51 to 5.0 " " " | 7% |
| 5.01 to 5.5 " " " | 8% |
| 5.51 to 6.0 " " " | 9% |
| 6.01 to 6.5 " " " | 10% |
| 6.51 to 7.0 " " " | 12½% |
| 7.01 and over " " " | 15% |

On lead, applying the Bunker Hill & Sullivan prices at Kellogg, Idaho, the same royalties as given above for zinc, plus one (1%) per cent. The royalty on each shipment of silver is to be the same as applied to the lead in the same shipment, except that in the event the silver content shall exceed Five and no/100 ($5.00) Dollars per ton of concentrates, then the royalty on said silver shall be subject to adjustment and agreement between the parties hereto and the royalty on any other minerals, except as above referred to, to be agreed upon between the parties hereto from time to time. The royalties shall be computed upon the total receipts as received from the smelter after deducting freight and treatment charges and shall be due and payable to the vendor from time to time upon receipt of the smelter returns.

\* \* \* \* \* \* \*

13. Should the purchaser elect to exercise its option to purchase the concentrating plant of the vendor, it shall then have two (2) years from the date of the exercise of such option within which to start mining operations upon the mining properties of the vendor, if it elects to conduct such operations thereon. Should the purchaser elect not to mine said properties, or, having commenced such mining operations, elect to discontinue the same, this shall in no wise affect the option of the purchaser to purchase the mill and other properties described in paragraph 1 hereof, but in that event the vendor shall have the right to mine and extract ores from its own property, and the quantity so mined shall be milled at the mill this day optioned by the vendor to the purchaser, provided, however, the purchaser shall not be required to mill at any time, more than one-half (½) of the daily capacity of the milling facilities of said plant, and the vendor shall pay to the purchaser, a milling charge of actual cost of milling, plus ten (10%) per cent. In the event that the net smelter price for zinc concentrates shall be Four and 25/100 ($4.25) Dollars per hundred or less, or the net smelter price for lead concentrates shall be Four and 25/100 ($4.25) Dollars per hundred or less, then and in that event, at the option of the purchaser, the payments herein provided for to be made for the purchase

of said mill shall be suspended until the price for zinc shall exceed Four and 25/100 ($4.25) Dollars per hundred and lead Four and 25/100 ($4.25) Dollars per hundred: Provided, that such payments shall not be suspended unless the operation of the concentrating plant is also suspended.

On August 24, 1936, Grandview and American entered into a supplemental agreement which clarified and added to details of the original agreement without abrogating any part of that original agreement. Again on May 17, 1940, petitioner and American entered into a second supplemental agreement which modified the rate, manner of computing, and time of payment of royalties set forth in the option agreement dated June 5, 1936. American exercised its option as granted in the agreement of June 5, 1936, to purchase equipment from Grandview on the Grandview properties.

By 1949, American found that costs and labor expenses had increased to the point that it could no longer make a profit from the operation of the Grandview properties under the existing arrangement. American indicated that unless the royalty arrangement were altered it would cease operations at the mine and on December 9, 1949, American informed Grandview by letter that it was necessary to alter the agreement to provide for different royalty payments. Several methods were proposed and on December 20, 1949, Grandview called a meeting of its directors to consider the letter of American. At that time, the directors who were present decided not to act immediately but to refer the matter to the entire board of directors. On December 30, Grandview requested information in writing from American as to the several suggested methods of computing the royalties from the operation.

By letter dated January 3, 1950, American submitted four proposals for consideration by the Grandview directors. One proposal suggested a new royalty schedule based on net smelter returns for lead and zinc. The second proposal suggested a continuation of the old royalty schedule not to exceed 50 per cent of the operating profit. The third proposal suggested profit sharing on a 40–60 basis, computed quarterly. Proposal four suggested profit sharing on a 50–50 basis with each participant to share in loss liability. American concluded the letter by stating that it favored the fourth proposal.

The directors of Grandview met again on January 16, 1950, to consider the proposals submitted by American. The minutes of the meeting indicate the proposals were interpreted by the directors to be in the form of an ultimatum to accept one of them or have the mine closed until prices increased or operating expenses declined. With this in mind, the directors elected to accept the proposal whereby they would operate the property on a 50–50 profit-sharing basis until January 1, 1952.

On January 26, 1950, Grandview and American entered into a formal agreement for the operation of the Grandview properties, pertinent parts of which are as follows:

1. All of the provisions of said original lease and of said supplements relating to royalties to be paid by American to Grandview are hereby abrogated and in lieu thereof American, from and after January 1, 1950, shall pay to Grandview in full settlement for all ores mined or extracted from any of Grandview's mining claims one-half of all net profit derived from the operation thereof by American.

2. The net profit of said operations shall be the total proceeds of sale of concentrates in each accounting period less all of the expenses of the operation during said accounting period.

3. The accounting method of American under this agreement shall be the same as heretofore followed by American in its operation of the Grandview Mill and mine. The basis for determining the value for zinc and lead concentrates shall be the same as that heretofore used for computing royalty.

4. The American as regular accounting practice determines estimated net profit for each calendar month and prepares a profit and loss statement for each month. In such statement the net revenue involved is based on shipments only during that month. The revenue value determined is largely an estimate which is adjusted from time to time and for each succeeding month as actual settlements are received from the smelter. It is understood that American charges off other liability obligations for which actual figures are not available and are handled on an estimate basis. It is possible also that a particular month may show a loss.

It is agreed by the parties that American will close out its business from an accounting standpoint at the end of the year, making all adjustments plus or minus and that for the purpose of distribution of profits as between Grandview and American each calendar year will be a final and complete accounting period for American in the discharge of its obligation relative to allocation of profits due Grandview.

The only exception to above is that any deferred settlements for concentrates produced during the year 1949 not settled for finally during 1949, will be adjusted to Grandview when final settlements are received from the smelter on the basis of the royalty schedule in effect until January 1, 1950.

American shall pay to Grandview their proportion of the estimated profits for each calendar month by the 15th of the succeeding month, such payments to be made on the basis of the regular monthly profit and loss statement, which statement will be attached to the check covering such statement.

5. The cost of exploratory and development work shall be charged off at an average rate over an accounting period of each calendar year beginning January 1, 1950 not to exceed $1.00 per ton. Should American determine that it seemed advisable to them to increase such development and exploratory expense for mutual benefit to an amount that will exceed $1.00 a ton as an average, they will, before increasing such expenditures beyond $1.00 a ton as an average, secure Grandview's approval for such increase.

6. American will furnish to Grandview a copy of all reports relating to the Grandview lease operations which are made by any of its operating agencies to its officers and shall semi-annually also furnish a schedule of all deferred charges against the operation and the rate at which each item thereof is being charged off.

7. American will supply to Grandview any information of any kind which it may possess concerning the operation of the Grandview lease and copies of any

available maps at any time upon the request of Grandview's officers or its board of directors.

8. Any officer of Grandview or any other person authorized by its board of directors shall have the right at any reasonable time to inspect any book or record of American kept in connection with the Grandview operation and to make such audit thereof as may be desired. Such authorized officers and/or other authorized persons shall also have the right at any reasonable time to make any inspection which may be desired of the mill, mine and any other part of the Grandview operation.

\* \* \* \* \* \* \*

12. Any provision of said original lease and of said supplements thereto, or of any of said instruments, which conflict with the provisions of this Third Supplemental Agreement are hereby cancelled but, except as to said matters, each and all of the terms and conditions of said original lease as modified by said supplemental and second supplemental agreements shall be and remain in full force and effect.

On July 8, 1950, Grandview communicated with American with respect to the operation of the mines under the new agreement. The communication stated, in part, as follows:

Six months have elapsed since the profit-sharing arrangement between Grandview and American Zinc became effective, and from an analysis made of the statements rendered to us and the observations made of your operations on the ground, we have reached the conclusion that this profit-sharing plan is not being carried out in an equitable manner so far as Grandview is concerned, and that Grandview is being called upon to pay its share of expenses that do not concern it or in any manner benefit our company, and we therefore ask for a written explanation of the following items and for a detailed accounting of each item:

Thereafter followed enumeration of four distinct items charged off against operation of the mines which Grandview considered improper or excessive. In addition, Grandview requested information with respect to invoices, engineer's reports, and maps of the mining developments. American responded on July 13, 1950, by answering the questions and suggested that officers of Grandview visit the offices of American to inspect the records of American and performance at the mine.

Subsequent to the end of the first year of operation under the new agreement, Grandview requested information from American as to the manner of computing the depletion allowance on the sales of zinc and lead concentrates. American notified Grandview on February 6, 1951, that it computed depletion as follows:

From the total sales value of zinc and lead concentrates is deducted the amount of royalty paid to your company. The remaining balance is the gross income on which the percentage depletion rate of 15% is applied. If the depletion thus determined does not exceed 50% of the net income from the property, such amount is used. If, however, 15% of gross income exceeds 50% of net income, our deduction is limited to 50% of the net income.

Subsequent to the above communication, Grandview notified American of its position that it was entitled to compute depletion on the basis of 50 per cent of net sales. American immediately replied by telegram

on February 10, 1951, that it did not agree with Grandview's manner of computing the depletion. The telegram stated:

We have your wire in which you state Grandview is entitled to at least 7½ per cent depletion allowance on 1950 net sales of concentrates. We do not agree that this is an equitable apportionment required under section 23 (m) of the Internal Revenue Code. We believe you are entitled to a deduction of 15 per cent of the amount of royalty payable to you for year 1950 provided this is less than 50 per cent of your net income. In the absence of agreement between your company and ours as to the equitable apportionment of the deduction, we suggest that each company compute depletion in manner it believes correct and each company handle the problem individually with Bureau of Internal Revenue.

Following this dispute, the parties entered into a new agreement which was an amendment to the third supplemental agreement dated January 26, 1950, which amendment was to take effect as of the date of the third supplemental agreement. The amendment provided, in part, as follows:

A. Paragraph 1 of said Third Supplemental Agreement is hereby cancelled and the following paragraph 1 is substituted in its stead:

1. All of the provisions of said original lease and of said supplements thereto relating to royalties to be paid by American to Grandview are hereby abrogated and in lieu thereof from and after January 1, 1950 and as long as this Third Supplemental Agreement remains in force, unless hereafter modified by agreement of the parties, American shall pay to Grandview in full settlement for all ores mined or extracted from any of Grandview's mining claims forty-six and one-half per centum (46½%) of all net profits derived from the operation thereof by American. This change in division of profits results in American having over paid Grandview for the accounting period of 1950 which has now been closed in the sum of $18,957.20 which amount Grandview shall repay to American. This repayment shall not affect any refunds which may be due from Grandview to American for operations in 1951 which will be adjusted for the 1951 accounting period.

B. Except as herein specifically amended said Third Supplemental Agreement and each and all of the terms and provisions thereof shall remain in full force and effect.

In 1951, subsequent to the execution of the amendment to the third supplemental agreement, petitioner paid American $18,957.20 as required by the amendment and American by letter dated June 1, 1951, formally indicated its understanding that for purposes of computing depletion under the income tax laws, the gross income from the properties would be treated as distributed 53½ per cent to American and 46½ per cent to Grandview. Grandview then filed its 1950 income tax return, computing depletion on the basis of 46½ per cent of gross income from the properties and deducted from that year's gross income the payment to American in 1951 of $18,957.20 as a result of the amendment to the agreement.

For the years 1950 through 1953, inclusive, American reported the gross income from the operation of the Grandview mines and computed its depletion allowance as follows:

## Calculation of Percentage Depletion

| | 1950 | 1951 | 1952 | 1953 |
|---|---|---|---|---|
| **Gross income:** | | | | |
| Sales of zinc concentrates | $852,331 | $1,323,861 | $1,027,733 | $539,271 |
| Sales of lead concentrates | 874,136 | 611,932 | 1,005,876 | 602,041 |
| Total | 1,726,467 | 1,935,793 [2] | 2,033,609 [3] | 1,141,312 [4] |
| Deduct: Credited to lessor | 797,929 | 900,144 | 945,628 | 580,710 |
| Gross income subject to percentage depletion | $928,538 | $1,035,649 | $1,087,981 | $610,602 |
| **Cost of operations—Mining:** | | | | |
| Breaking ground | 244,243 | 223,010 | 196,551 | 174,168 |
| Mechanical mucking and loading | 96,649 | 110,947 | 122,234 | 84,477 |
| Haulage | 42,459 | 67,889 | 61,574 | 39,723 |
| Blacksmith shop | 43,057 | 52,790 | 48,519 | 30,918 |
| Change house | 7,890 | 5,868 | 4,706 | 4,388 |
| Hoisting, transportation and storage | 22,582 | 42,902 | 29,607 | 22,445 |
| Sundries | 41,146 | 54,428 | 66,443 | 65,786 |
| Drainage | 1,269 | 127 | 10,184 | |
| Development (operating expense) | 206,956 | 243,439 | 208,715 | 109,020 |
| Electric power | 8,735 | 11,088 | 6,245 | 2,519 |
| Total mining | 714,986 | 812,488 | 754,778 | 533,444 |
| Concentrating expense | 333,772 | 417,666 | 453,485 | 322,926 |
| Plant administrative and general expenses | 80,796 | 80,993 | 80,769 | 130,907 |
| Discounts on purchases | (1,299) | (2,603) | (2,236) | (2,028) |
| Miscellaneous | | (799) | 840 | 224 |
| Charged to lessor | (495,302) | (609,176) | (595,463) | (464,197) |
| Inventory at Dec. 31, 1949 | 4,884 | | | |
| Inventory at Dec. 31, 1950 | (6,861) | 6,861 | | |
| Inventory at Dec. 31, 1951 | | (7,950) | 7,950 | |
| Inventory at Dec. 31, 1952 | | | (16,606) | 16,606 |
| Inventory at Dec. 31, 1953 | | | | (6,037) |
| Cost of operations | 630,976 | 697,480 | 683,517 | 531,845 |
| Home office administrative expenses (apportioned on basis of cost of operations) | 6,653 | 12,230 | 5,638 | 2,758 |
| Depreciation | 3,315 | 3,315 | 3,373 | 1,124 |
| Total costs | 640,944 | 713,025 | 692,528 | 535,727 |
| Net profit subject to percentage depletion | 287,594 | 322,624 | 395,453 | 74,875 |
| **Percentage depletion calculation:** | | | | |
| 15 per cent of gross income | 139,281 | 155,347 | 163,197 | 91,590 |
| 50 per cent of net profits | 143,797 | 161,312 | 197,727 | 37,438 |
| Percentage depletion allowable | 139,281 | 155,347 | 163,197 | 37,438 |
| Profit after deducting depletion | 148,313 | 167,277 | | 37,438 |

[1] Sales of 1950 production at 46½ per cent ($1,714,327 at 46½ per cent) ------ $797,162
Add: Royalty on sales of 1949 production ------ 767
797,929

[2] Sales of 1951 production at 46½ per cent ($1,935,793 at 46½ per cent) ------ $900,144
[3] Sales of 1952 production at 46½ per cent ($2,033,609 at 46½ per cent) ------ $945,628
[4] Sales of 1953 production at 46½ per cent ($1,141,312 at 46½ per cent) ------ $530,710

For the years 1950 through 1953, inclusive, Grandview reported gross income and computed its depletion allowance and net income as follows:

| | 1950 | 1951 |
|---|---|---|
| Gross receipts | $1,714,327.10 | $290,968.18 |
| Less cost of operations | (1,172,692.70) | |
| Gross profits | 541,634.40 | 290,968.18 |
| Less amount retained by lessee under profit-sharing agreement | (289,774.44) | |
| Interest on bonds | 613.00 | 1,461.11 |
| Royalties | 767.10 | |
| Other income | 340.71 | 417.76 |
| Total income | $253,580.77 | $292,847.05 |
| Deductions: | | |
| Salaries | 3,550.00 | 7,300.00 |
| Wages | 2,858.00 | 7,952.50 |
| Rent | 382.50 | 625.00 |
| Interest | 151.66 | 298.43 |
| Taxes | 1,074.34 | 2,140.98 |
| Contributions | 206.00 | |
| Depreciation | 73.61 | 515.70 |
| Depletion | 119,689.38 | 131,494.22 |
| Other deductions | 5,385.15 | 11,026.00 |
| Total deductions | (133,370.64) | (161,352.83) |
| Net income | 120,210.13 | 131,494.22 |
| Depletion computation: | | |
| Total production (sales) | 1,714,327.10 | 1,935,793.57 |
| Share of profits (46½ per cent) | 797,162.10 | 900,144.01 |
| Depletion at 15 per cent | 119,574.32 | 135,021.60 |
| 15 per cent of royalties | 115.06 | |
| Total depletion | 119,689.38 | 135,021.60 |
| Limitation: 50 per cent of net income reported | 120,210.13 | 131,494.22 |
| Depletion claimed | 119,689.38 | 131,494.22 |
| Net income before depletion | 239,899.51 | 262,988.44 |
| 50 per cent thereof | 119,949.76 | 131,494.22 |

| | 1952 | 1953 |
|---|---|---|
| Gross receipts | 945,628.19 | 530,710.00 |
| Less cost of operations | (595,463.51) | (464,197.00) |
| Gross profits | 350,164.68 | 66,513.00 |
| Interest on bonds, etc | 793.00 | 1,080.04 |
| Rents | | 420.00 |
| Other income | 369.33 | 1,958.46 |
| Total income | 351,327.01 | 69,971.50 |
| Deductions: | | |
| Salaries | 7,500.00 | 9,608.60 |
| Wages | 8,017.33 | 6,674.40 |
| Rent | 600.00 | 1,200.00 |
| Interest | 126.45 | 35.54 |
| Taxes | 1,818.39 | 1,598.67 |
| Depreciation | 1,009.44 | 1,975.76 |
| Depletion | 141,844.23 | 25,474.17 |
| Other deductions | 56,051.62 | 36,209.62 |
| Total deductions | (216,967.46) | (82,776.76) |
| Net income | 134,359.55 | (12,805.26) |
| Depletion computation: | | |
| Gross receipts | 945,628.19 | 530,710.00 |
| Deductions | (610,220.59) | (479,761.65) |
| Net income before depletion | 335,407.60 | 50,948.35 |
| 50 per cent thereof | 167,703.80 | 25,474.17 |
| Depletion deduction allowed under sec. 114 | 141,844.23 | 25,474.17 |

Subsequent to the filing of the 1950, 1951, and 1952 corporation income and excess profits tax returns, petitioner's returns were examined by an agent of the Internal Revenue Service. The agent made a request of petitioner's accountants that partnership returns for those years be filed. It was the opinion of the accountants that the request should be complied with and by letter dated November 30, 1954, expressed that opinion to Grandview. The accountants suggested that American should prepare and execute the necessary returns, since it possessed the necessary information, and forward them to Grandview for filing with the internal revenue agent. Grandview, by letter dated December 7, 1954, requested American to prepare the partnership returns and forward them to Grandview. Partnership income tax returns were prepared by American for the years 1950 through 1953, inclusive, and subsequently filed with the director of internal revenue at St. Louis, Missouri, on December 14, 1954. Petitioner did not take an excess output credit deduction for the years 1950 and 1951 in determining its excess profits tax liability.

Within the period, as provided by the statute, and extended by timely waivers filed by petitioner, respondent determined that petitioner had improperly reduced its income for 1950 by the amount of the payment made to American in 1951, and that petitioner had incorrectly computed the depletion allowance for the years 1950 through 1953, inclusive. Petitioner petitioned this Court for redetermination of the taxes for those years and a finding of an overpayment for the years 1950 and 1951 because it had failed to take a deduction for the excess output credit for purposes of determining its excess profits tax liability.

OPINION.

*Issue 1.*

Petitioner maintains that it properly computed the depletion allowance for the years in question on the basis of a percentage of total proceeds from the operation of the property by American. In support of this position, petitioner argues, first, that the agreement in effect during the years at issue allocated total proceeds and total expenses of the operation between it and American. Secondly, petitioner argues that it actually participated in the management and operation of the property and was responsible for a portion of the expenses. Thirdly, petitioner claims that the parties themselves agreed that petitioner was to compute depletion on the basis of total proceeds. The respondent, on the other hand, has determined that the base upon which petitioner should compute its allowance for depletion is its share of the net profits from the operation, asserting, in effect, that those net profits were petitioner's gross income from the property.

As for petitioner's first argument, it claims to receive more from the agreement than its plain words provide. The third supplemental agreement between Grandview and American was entered into on January 26, 1950. Paragraph 1 provided that American would pay Grandview one-half of the "net profit" derived from the operation in full settlement for all ores mined or extracted. This arrangement was in substitution for the original royalty agreement which had fixed the royalty at so much per ton of ore mined, regardless of whether or not American was able to make a profit. The wording of the third supplemental agreement is simply that of another royalty arrangement. *Kirby Petroleum Co.* v. *Commissioner*, 326 U.S. 599 (1946). Petitioner, however, then construes paragraph 2 of the agreement, which defines "net profit," as giving it one-half of total proceeds in payment for the ores extracted. Paragraph 2 provides:

2. The net profit of said operations shall be the total proceeds of sale of concentrates in each accounting period less all of the expenses of the operation during said accounting period.

This paragraph does not provide that petitioner shall receive one-half of all proceeds and then be required to pay therefrom its share of expenses attributable to the production of that share of the proceeds. It is clearly a definition of "net profits" and nothing more. Petitioner's interpretation would require us to conclude that the term "net profits" is the same as total proceeds. Such a conclusion is obviously incorrect since the definition itself requires the subtraction of expenses prior to arriving at the "net profit" figure. The amendment to the third supplemental agreement did not alter this definition of net profits. It changed only the percentage of net profits which petitioner was to receive for the mining and extraction of ores from its property.

Petitioner's second contention is based on the existence of a partnership or joint venture between itself and American for the joint operation of the property and the sharing in income and expenses attributable thereto. Petitioner maintains that it was to be charged with a portion of the expenses and relies on *J. S. Abercrombie Co.*, 7 T.C. 120 (1946), affd. 162 F. 2d 338 (C.A. 5, 1947), and *Reynolds* v. *McMurray*, 60 F. 2d 843 (C.A. 10, 1932), in support of its position. It is not necessary to decide the question of whether a joint venture or partnership existed. Regardless of whether such a form of carrying on the mining business existed, petitioner's participation was no more than that of either a limited partner or joint adventurer limited to a share of net profits. Petitioner is not required to bear any portion of losses should they occur, and it is not obligated to pay any part of the expenses.

Petitioner argues that it shares in the expenses of the operation to the extent that its share of the total proceeds meets the expenses, as held in *J. S. Abercrombie Co.* and *Reynolds* v. *McMurray*, both *supra*.

However, both of those cases dealt with factual situations distinguishable from those here. In *J. S. Abercrombie Co.*, the taxpayer held an undivided one-sixteenth working interest in a producing well. That interest was specifically credited with one-sixteenth of all proceeds and charged with one-sixteenth of all expenses. In *Reynolds* v. *McMurray*, one coowner made advances for the benefit of the other coowner, and was repaid out of the earnings from the property. In this case American has not made advances on behalf of petitioner, did not allocate a portion of total proceeds to petitioner, and did not charge petitioner's interest with a share of the expenses.

Petitioner's evidence which it contends indicates a participation in the management and operation of the property consists of a letter it sent to American alleging that American had allocated excessive expenses to the cost of operation, periodic inspection of the operation, and right to limit expenses to $1 per ton of ore mined. However, this evidence of Grandview's concern over the operation is entirely consistent with the existence of a mere net income interest. Accordingly, it does not overcome the correctness of the respondent's determination. *J. M. Lyon*, 1 B.T.A. 378 (1925).

Finally, with respect to this issue, petitioner contends that the parties agreed that petitioner was to compute its depletion allowance on the basis of total proceeds. American specifically indicated by a letter to Grandview, that for purposes of computing the depletion allowance, the gross income of the operation was to be treated as divided 46½ per cent to Grandview. The parties apparently have bargained with respect to the basis of a tax deduction. Deductions must be computed in accordance with the Internal Revenue Code and one may not deduct that which the Code allows as a deduction of another. *Magruder* v. *Supplee*, 316 U.S. 394 (1942); *Rita S. Goldberg*, 15 T.C. 696 (1950). The depletion deduction is based on the gross income of the taxpayer from the property. Sec. 114(b)(4), I.R.C. 1939. Petitioner's gross income from the property for this purpose was one-half of the net profits from the property for 1950 and 46½ per cent of those profits for the subsequent years. *Kirby Petroleum Co.* v. *Commissioner, supra.*

### Issue 2.

Petitioner contends that the $18,957.20 paid to American in 1951 is deductible as an ordinary and necessary business expense of that year. Petitioner argues that the identical amount had been received in 1950 and included in that year's income and that, therefore, the repayment of that amount gives rise to a deduction in the year of repayment, namely, 1951. Petitioner maintains that the amount was properly included in 1950 income under the claim-of-right doctrine, citing *North American Oil* v. *Burnet*, 286 U.S. 417 (1932), and relies on the

same doctrine in support of the proposition that the later repayment of amounts so included will give rise to a deduction in the year of repayment, citing, in addition to *North American Oil* v. *Burnet, supra, United States* v. *Lewis,* 340 U.S. 590 (1951).

The income tax is based upon the concept of an annual accounting period, and the claim-of-right doctrine grew out of the necessity of giving finality to that period. *United States* v. *Lewis, supra.* Essentially, the doctrine was designed to deal with the situation where a taxpayer had received income and then later found, for any of a variety of reasons, that he was not entitled to retain it. In the instant case, there was never any question either in 1950 or subsequently but that petitioner was entitled absolutely, under the terms of the then existing contract, to the $18,957.20 received in 1950. There was no dispute that petitioner was entitled to the full 50 per cent of net income in 1950, and neither petitioner nor American raised any question as to the proper computation to arrive at the amount. Petitioner received in 1950 exactly what was called for by its contract with American. Subsequently, in 1951, the parties voluntarily altered their respective rights under the agreement and chose to predate the operative date of the amendment. Therefore, despite the predating of the new agreement, the event which gave rise to the payment by petitioner in 1951 arose subsequent to 1950 and clearly does not affect the correctness of the payments received in the earlier year. Thus, the inclusion of the $18,957.20 in 1950 income is not grounded on a theory that petitioner received it under a *claim* of right but on the simple incontrovertible fact that it received it under an absolute right.

As a result, we are not confronted here with exactly the same type of repayment considered in the claim-of-right cases and with respect to which the courts have suggested a deduction as appropriate in the year of repayment. *North American Oil* v. *Burnet, supra.* Nevertheless, the question remains of how the 1951 payment should be treated for tax purposes. Petitioner asserts that the payment plainly was not gratuitous and that it must, therefore, be considered an ordinary and necessary expense of doing business in 1951, deductible in full in that year. While we agree that the payment was not a gratuity, and the respondent does not suggest otherwise, the alternatives are not so limited as petitioner suggests. The respondent contends that the payment in 1951 was in the nature of a capital expenditure, and we agree.

Petitioner had originally asserted the right to compute its depletion allowance on the basis of gross receipts. This right was disputed by American, which was of the opinion that a depletion allowance based on 50 per cent of gross income from the properties would result in less earnings to it than it was willing to receive for continued operations. As a result, the two parties agreed that Grandview would receive 46½ per cent of net income and compute its depletion on the basis of

46½ per cent of gross income. To properly compensate American for its operations of the properties and equalize the distribution of profits for 1950, Grandview obligated itself to pay American $18,957.20. This payment then left the parties in the same position they would have been in if the agreement had been in effect from the first part of 1950. That this was the intention of the parties was indicated by the fact that they predated the 1951 amendment to the date of the 1950 agreement.

The agreement by which Grandview became obligated to pay American the $18,957.20 states:

This change in division of profits results in American having over paid Grandview for the accounting period of 1950 which had now been closed in the sum of $18,957.20 which amount Grandview shall repay to American.

Clearly the payment was a part of the consideration which Grandview gave to American in exchange for the right to compute depletion on the basis of total receipts, although, in accordance with our decision on the depletion issue, the parties were unsuccessful in their effort to allocate by contract the statutory depletion allowance. Indeed, on brief, petitioner states the following:

The payment had all of the essential attributes of any consideration. It represented a benefit to petitioner because the agreement pursuant to which the payment was made established the nature and extent of petitioner's interest in the gross proceeds from the sale of concentrates * * *. It represented a detriment to American because the agreement pursuant to which the payment was made had the effect of limiting the percentage depletion which American might claim to 15% of 53½% of the gross income. * * *

The payment in question was not an expense of carrying on a business for the year 1950 since petitioner did not become obligated to pay American the amount until 1951. *Fifth Avenue Coach Lines, Inc.*, 31 T.C. 1080 (1959). The payment in 1951 was a payment in consideration of American's continuing under the contract throughout its life and was, therefore, a capital expenditure. However, the petitioner has suggested no basis for the ratable recovery of such a capital expenditure, and, insofar as we have been able to determine from the evidence before us, the agreement itself was without any fixed and ascertainable life but was to remain in effect for an indefinite period so that there is in fact no basis upon which the amount could be amortized. It may be that petitioner can look only to its allowance for percentage depletion for recovery of this amount. However, this is not a question we need decide.

### Issue 3.

Petitioner contends that it is a producer of a mineral within the meaning of section 453(a)(1) of the Excess Profits Tax Act of 1950 and is, therefore, entitled to an exempt excess output credit. Since petitioner did not in fact take such a deduction on its returns for the

years 1950 and 1951, the credit is the basis of the alleged overpayment for those years.

Section 433(a)(1)(I) of the Excess Profits Tax Act of 1950 provides, in part, as follows:

SEC. 433. EXCESS PROFITS NET INCOME.

(a) TAXABLE YEARS ENDING AFTER JUNE 30, 1950.—The excess profits net income for any taxable year ending after June 30, 1950, shall be the normal-tax net income, as defined in section 13(a)(2), for such year increased or decreased by the following adjustments:

(1) ADJUSTMENTS.—

\* \* \* \* \* \* \*

(I) Nontaxable Income of Certain Industries With Depletable Resources.—In the case of a producer of minerals, or a producer of logs or lumber from a timber block, or a lessor of mineral property, or a timber block, as defined in section 453, there shall be excluded nontaxable income from exempt excess output of mines and timber blocks provided in section 453; in the case of a natural gas company, as defined in section 453, there shall be excluded nontaxable income from exempt excess output provided in section 453; and in the case of a producer of minerals, or a producer of logs or lumber from a timber block, there shall be excluded nontaxable bonus income provided in section 453. In respect of nontaxable bonus income provided in section 453(c), a corporation described in section 453(c)(2) shall be deemed a producer of minerals for the purposes of this subparagraph;

Section 453(a)(1) defines a producer and lessor of mineral properties as follows:

SEC. 453. NONTAXABLE INCOME FROM CERTAIN MINING AND TIMBER OPERATIONS, AND FROM NATURAL GAS PROPERTIES.

(a) DEFINITIONS.—For the purposes of this section and section 433(a)—

(1) PRODUCER; LESSOR; NATURAL GAS COMPANY.—The term "producer" means a corporation which extracts minerals from a mineral property, or which cuts logs from a timber block, in which an economic interest is owned by such corporation. The term "lessor" means a corporation which owns an economic interest in a mineral property or a timber block, and is paid in accordance with the number of mineral units or timber units recovered therefrom by the person to which such property or block is leased. The term "natural gas company" means a corporation engaged in the withdrawal, or transportation by pipe line, of natural gas.

Petitioner does not claim that it is a lessor within the meaning of the above-quoted section, and it seems clear that it does not fit the definition of a lessor since its payments are not measured by the number of units produced. On the other hand, petitioner claims that it is a "producer" and that the regulations under the section specifically recognize that the owner of a mineral property may contract with another for removal of the minerals without losing its status as a "producer." The regulations define the term "producer" as follows:

Regulations 130.

Sec. 40.453–2 Definitions. For the purposes of section 453 and section 433(a) (1)(I)—

(a) *Producer; lessor; natural gas company*—(1) *Producer.* (i) The term "producer" means a corporation which extracts minerals from a mineral property, or cuts logs from a timber block, in which an economic interest is owned by such corporation. Although section 433(a)(1)(I) excludes certain nontaxable income in the computation of excess profits net income in the case of a producer of logs or lumber, a producer of lumber is not within the provisions of this subsection unless such corporation is also a producer of the logs from which such lumber is sawed. An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in minerals in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the mineral or timber, to which it must look for a return of its capital. A taxpayer which has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because, through a contractual relation to the owner, it possesses a mere economic advantage derived from production. Thus, an agreement between the owner of an economic interest and another entitling the latter to purchase the product upon production or to share in the net income derived from the interest of such owner does not convey an economic interest. The mere ownership of the development and plant necessary to the extraction of the minerals in place or the felling and logging of the timber is not an economic interest for the purposes of section 453. Thus, a corporation which owns the equipment necessary to the extraction of minerals or the logging of timber and which acts as an independent contractor or as an agent in extracting minerals or timber, receiving as consideration a portion of the net income from the property, but which does not own an economic interest in the mineral property or timber block is not a producer within the provisions of this subsection. *However, the owner of the economic interest in the mineral property or timber block and from which the mineral or timber is being extracted by the independent contractor or the agent is the producer within the provisions of this subsection.* [Emphasis added.]

The above regulation must be construed together with section 453(a)(1) of the statute under which it was promulgated. The statute itself makes it quite clear that a "producer" is a corporation which *extracts* minerals from a property in which it owns an economic interest. The plain fact of the instant case is that petitioner is not the extractor of the minerals from the property. American is the extractor. Thus petitioner is not a "producer" as defined by section 453(a)(1). It is true, as pointed out by petitioner, that the regulation issued thereunder does provide that an owner may be within the definition of "producer" under certain circumstances even though the actual extraction of the minerals is performed by someone else. However, the regulation provides that the owner is the "producer" in such a case *only* where the party performing the actual extraction does not have an economic interest in the mineral property. The reason for this construction of the statute by the regulation is obvious because without it there would be cases in which neither the owner nor the extractor would be entitled to the exempt excess output credit, a frustration of the purpose of the statute.

That situation does not exist here because the corporation extracting the mineral, American, owns an economic interest in the property.

Petitioner does not contend otherwise. American receives the proceeds from the operation and is required to "pay to Grandview in full settlement for all ores mined or extracted" 46½ per cent of the net income from the properties. Grandview does not compensate American for the extraction of ores. Neither does it receive payment for the ores extracted from its properties according to the number of units produced. Its interest is measured only by a percentage of net profits. Therefore, we hold that petitioner is not a "producer" within the meaning of section 453(a)(1).

This conclusion is supported by the legislative history of the section which demonstrates that the section was intended as an incentive for increased production over normal output in the case of certain minerals, timber, and natural gas.[1] Here, American was in complete charge of the operations and any incentive for greater production intended by the section could affect it alone since Grandview's participation was limited to a share of net profits. Petitioner was not entitled to an exempt excess output credit and, thus, there was no overpayment as claimed by it.

*Decision will be entered for the respondent.*

---

[1] Report of the House Committee on Ways and Means to accompany H.R. 9827, H. Rept. No. 3142, 81st Cong., 2d Sess., p. 59 ; Report of the Committee on Finance, U.S. Senate, to accompany H.R. 9827, S. Rept. No. 2679, 81st Cong., 2d Sess., pp. 32, 33.