**UNITED STATES of America,**
**Appellant,**

v.

**Joseph M. THOMAS and Jill G. Thomas,**
**Appellees.**

**No. 18306.**

United States Court of Appeals
Ninth Circuit.

March 12, 1964.

Rehearing Denied April 14, 1964.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, and Michael Mulroney, Attys., Dept. of Justice, Washington, D. C., Francis C. Whelan, U. S. Atty., Walter S. Weiss, Chief Tax Section, Asst. U. S. Atty., and Thomas H. McPeters, Asst. U. S. Atty., Los Angeles, Cal., for the appellant.

Koster & Kohlmeier, and Bayley Kohlmeier, San Francisco, Cal., for the appellees.

Scott C. Lambert, San Francisco, Cal., for amicus curiae Standard Oil Co.

Edmund D. Buckley, Los Angeles, Cal., for amicus curiae Tidewater Oil Co.

L. A. Gibbons, Los Angeles, Cal., for amicus curiae Union Oil Co.

William J. DeMartini, Los Angeles, Cal., for amicus curiae Richfield Oil Co.

William R. Miller, Los Angeles, Cal., for amicus curiae Signal Oil & Gas Co.

Robert E. Friedman, Los Angeles, Cal., for amicus curiae Mobile Oil Co.

Adam Y. Bennion, Los Angeles, Cal., for all amicus curiae.

Before CHAMBERS, BARNES, HAMLEY, JERTBERG, MERRILL, KOELSCH, BROWNING and DUNIWAY, Circuit Judges.

JERTBERG, Circuit Judge.

On their joint Federal Income Tax Returns for the calendar years 1953 and 1954, appellees, who report their income on the cash receipts and disbursements method, computed their deductions for percentage depletion on the basis of the net amounts received by them from the operators of certain oil and gas properties. Appellees timely filed claims for refunds for overpayments and claimed therein that they were entitled to compute percentage depletion on the basis of a share in the gross income from the oil and gas operations. The claims were rejected by the Commissioner. Appellees filed a timely suit in the District Court to recover such claimed overpayments. Following trial, judgment was entered in their favor.

The broad question presented on the appeal is the amount which the appellees are entitled to use as a base for computing the percentage depletion.

Through a series of assignments of interests in oil and gas leases and subleases, and operating agreements held by Quality Oil Company, hereinafter "Quality", appellees on October 25, 1949 acquired an undivided ten percent (10%) in the subleases held by Quality and Richfield Oil Corporation, hereinafter "Richfield", and an undivided one-sixth ($\frac{1}{6}$) interest in subleases held by Quality and Hancock Oil Company of California, hereinafter "Hancock".

The interests which appellees acquired arose in the following manner:

In 1948, Quality was sublessee under certain oil and gas leases and owned the exclusive right to the oil, gas and other hydrocarbon substances in the property described in the oil and gas leases, subject only to the payment of royalties to the landowners and other parties having royalty interests therein. On March 17, 1948, Quality entered into two contemporaneous agreements with Richfield relating to a specified portion of the land under its sublease. Under one of the agreements, entitled "PARTIAL ASSIGNMENT OF OIL AND GAS LEASES", Quality assigned to Richfield an undivided 70% "of all * * * [its] right title and interest * * * in and to" the two subleases and "in and to the estates created by said leases" as to part of the land specified. The partial assignment stated that Quality retained an undivided 30% "in and to" the subleases; that royalties and other sums of money "with respect to the interest of assignor and assignee in said leases" relating to the part of the land covered by the agreement were to be paid in accord-

ance with an "operating agreement" made and entered into concurrently with the assignment.

Paragraphs 4 and 6 of the assignment read as follows:

"4. All geological, exploratory, drilling, operating and producing operations, and all other operations with respect to the hereinabove described lands, shall, notwithstanding the separate ownership by Assignor and Assignee of undivided interests in said leases, be conducted as an entirety and as the operation of one lessee, all in accordance with terms and conditions of said operating agreement hereinabove mentioned."

"6. Neither Assignor nor Assignee shall hereafter sell, assign, transfer, convey, quitclaim or otherwise dispose of any interest in said leases, or either of them, or in the lands leased thereby or in the estates created thereby, without the written consent of the other party hereto, except in accordance with the terms and conditions of said operating agreement hereinabove mentioned."

The operating agreement entitled "OPERATING AGREEMENT (carried interest)" referred to the partial assignment by Quality of an undivided 70% leasehold interest to Richfield and recited that Richfield "is an operating company, experienced in the development and operation of oil and gas properties, and it is desirable for the parties hereto to enter into this operating agreement because of the ownership by each party hereto of an undivided interest in and to said leases in so far as they affect said joint lands." Under paragraph 1 of the agreement, Richfield was designated as the "operator" of the joint lands and was given, for the purposes of this agreement,

"the sole and exclusive right to explore for, drill for, operate for, develop, produce, save, process and/or market oil, gas, and other hydrocarbon substances in, under or re-

coverable from said joint lands, and to extract and/or manufacture products therefrom during the term of this operating agreement, or any renewal or extension hereof, and Richfield, as such Operator, shall conduct and manage the operation of the joint lands for the exploration, discovery, development, and production thereon and therefrom of oil, gas, and other hydrocarbon substances under the terms and conditions of said leases and this agreement."

Richfield was required to commence drilling operations within six months or in lieu thereof Richfield could terminate the operating agreement and reassign or quitclaim all of its right and interest in and to the joint lands. Richfield was required to maintain a "joint account" which meant "the accounting to be maintained by Richfield as operator hereunder, for the purpose of recording all joint expenses, transfers, revenues, income and other transactions pertaining to the joint lands and the operations thereof, and for the purpose of maintaining records and rendering statements to the parties hereto and settling accounts between them."

In the "joint account" Richfield was to record the gross revenues from operations, except for royalties payable to other parties; Richfield was also to record in the "joint account" and as "joint expense" the costs and expenses of every nature including all costs of exploration, discovery, drilling, developing, equipping, operating and maintaining the property, and of producing and marketing oil and gas obtained therefrom, as well as all other charges and liabilities, including the sum of $40,000 paid by Richfield to Quality for the assignment by Quality to Richfield of the interest in joint lands, "and the parties shall share therein and pay therefor in the proportion of 70% by Richfield and 30% by Quality." The operating agreement provided more detailed accounting procedures in Exhibit "A" attached to the agreement.

Paragraphs 6, 7, 9, 12, 13, 16, 22 and 24 of the agreement provide:

"6. Richfield, as Operator hereunder, shall, in the first instance, pay all joint expense and shall charge the same to the joint account between Richfield and Quality as joint expense. Richfield, as Operator hereunder, shall credit all gross revenues from operations hereunder to the joint account. Quality shall not be personally liable for joint expense other than to the extent of its interest in gross revenues, and Richfield, as Operator, shall reimburse itself for joint expense solely from the joint account and the gross revenues therein, and may recover all joint expense to the extent that joint expense can be recovered from gross revenues by crediting to the joint account all such gross revenues. No net proceeds shall accrue during any calendar month until the joint account has been reimbursed for all net deficits for the current and preceding calendar months from gross revenues credited to the joint account, and until Richfield as Operator hereunder, has been fully reimbursed for all joint expense theretofore charged to the joint account."

"7. Richfield, as Operator hereunder, shall credit to the joint account, as joint income, the gross revenues from operations hereunder, consisting of the gross proceeds from the sale of all oil and gas sold by Richfield, as Operator hereunder, and the market value, as hereinafter defined, of all oil and gas not sold but taken by Richfield for its own use, except as provided in paragraph 10 hereof, and except royalties taken by parties other than the parties hereto or paid in kind to parties other than the parties hereto, and the gross proceeds from any sundry sale or service rendered by Richfield, as Operator hereunder, for the benefit of joint operations."

"9. The excess, if any, of gross revenues, over and above all joint expense of operations hereunder, shall be the 'net proceeds' from operations hereunder, and the excess, if any, of all such joint expense, over and above gross revenues shall be the 'net deficit' from such operations, and if, as, and when net proceeds shall accrue, then Richfield shall be entitled to receive seventy (70) per cent thereof and Quality shall be entitled to receive thirty (30) per cent thereof, except that Richfield, as Operator hereunder, shall deduct from Quality's thirty (30) per cent of net proceeds and retain for its own use hereunder the accumulated interest charges referred to in paragraph 12 hereof, and shall also be entitled to establish, retain, maintain, and deduct from Quality's thirty (30) per cent of said net proceeds a reserve operating fund of $25,000. Richfield, as Operator hereunder, shall pay to Quality, in cash, on or before the last day of each succeeding calendar month, Quality's remaining portion of Quality's thirty (30) per cent share in the net proceeds accrued in the joint account from operations hereunder, to the end of the preceding calendar month and not theretofore paid, and the remaining seventy (70) per cent of such net proceeds shall be the share belonging to and shall be paid to or retained by Richfield hereunder."

"12. Richfield, as Operator, shall charge Quality interest on thirty (30) per cent of the net deficit in the joint account, as shown by the monthly statements herein elsewhere referred to, at the rate of four (4) per cent per annum, such interest to be recovered by Richfield, as Operator, only from Quality's thirty (30) per cent of the net proceeds due to Quality hereunder if, as, and when such net proceeds shall accrue."

"13. Richfield, as Operator hereunder, shall have the sole and exclusive right and privilege of exercising any and all rights necessary

or convenient for the exploration, discovery, development, production or operation for oil or gas on the joint lands, and Operator shall have full control and management of all exploration, discovery, development, production, processing, marketing, transportation and other operations in and on the joint lands, with the full power to do whatever, in its exclusive judgment, may be reasonably necessary or expedient therefor. Richfield, as Operator hereunder, shall not be required to drill any well or wells or to conduct any operations on the joint lands, but Richfield, as Operator hereunder, subject always, however, to the right of Richfield to terminate this agreement and quitclaim and/or reassign to Quality its interest in said leases at any time, as to all or any part of said joint lands, thereby relieving itself of all obligations under said leases and under this operating agreement as to said joint lands, or the portion thereof so quitclaimed and/or reassigned, shall drill such wells and conduct such operations on said joint lands as may be required by said Norris lease and/or said O'Day lease in order to maintain said leases in effect with respect to said joint lands. Quality agrees to drill such wells and conduct such drilling and development operations on the portions of the lands leased by said Norris lease and said O'Day lease, which are not included in said joint lands, as may be required by said leases in order to maintain said leases in full force and effect, and upon failure of Quality so to do, after twenty (20) days' written notice from Richfield so to do, said lands shall, at the option of Richfield, be included under this operating agreement as joint lands, and Richfield, as Operator hereunder, may drill such wells and conduct such drilling and development operations thereon as it may elect to do under this operating

agreement. In such event, Quality shall assign to Richfield seventy (70) per cent of all of its right, title, and interest in and to said leases in so far as they affect the lands leased by said Norris lease and said O'Day lease to be so included in said joint lands. Quality shall have the right to consult with and advise Richfield, as Operator, in connection with operations hereunder, but the final determination in all matters shall rest solely with Operator."

"16. Operator will, on or before the last day of the calendar month following the month in which a well on said joint lands is placed on production, render a statement of accumulative joint expenses, and will thereafter, on or before the last day of each calendar month render to Quality a statement of accumulated gross revenues, joint expenses, and net proceeds or net deficit for the preceding calendar month, showing—

"(a) All joint expense incurred during the preceding calendar month.

"(b) All oil and gas or products derived therefrom shipped from the joint lands by Operator during the preceding calendar month in quantities, quality, and gravity.

"(c) All oil and gas, or products derived therefrom, sold and the amount received for the joint account.

"(d) The market value of any oil and gas, or products derived therefrom, taken, retained or used by Richfield for its own use (including a statement of the cost of trucking or transportation of the same if the price to be paid Richfield is to be reduced by the amount of such cost).

"(e) The proceeds from any sundry sale or service rendered by Operator for the benefit of joint operations hereunder.

"(f) All rentals, royalties, and lease payments paid for the joint account.

"(g) The net proceeds or net deficit of the joint account, as the case may be."

"22. Title to all buildings, structures, improvements, facilities, equipment, materials and supplies constructed, installed or placed on the joint lands in connection with joint operations hereunder, shall be and remain in Operator and Quality shall have no interest therein, except that Quality shall have the right to have the joint account credited with the value of any thereof removed from the joint account, as provided in the Exhibit "A" hereof. Upon the termination of this agreement as to all or any part of said joint lands, all such buildings, structures, improvements, facilities, equipment, materials and supplies not deemed necessary or convenient by Operator for operations on the part of said joint lands still subject to this operating agreement shall be disposed of and the proceeds divided, as provided for in the Exhibit "A" hereof, upon the basis of seventy (70) per cent thereof to Richfield and thirty (30) per cent thereof to Quality, provided that no such division shall be made until Richfield, as Operator, has been reimbursed for all joint expense incurred by it hereunder, including the cost of abandonment of any and all wells drilled on said joint lands as to which this operating agreement is so terminated."

"24. It is not the intention of the parties hereto to create, nor shall this agreement be construed as creating, a partnership between parties hereto, or to render them liable as partners, and neither of the parties hereto shall be or act as the agent, servant or employee of the other for any purpose whatsoever."

Paragraph 14 lists many different things which Richfield as Operator has the sole and exclusive right to, and shall do, the costs and expenses of which are to be charged to joint expense.

By paragraph 18, Richfield had the right to terminate the agreement at any time as to all or any part of the joint lands, provided, upon any such termination, Richfield was required to quitclaim and/or reassign to Quality all of its right, title and interest in and to said leases in so far as they affect the part of the joint lands as to which the operating agreement is so terminated.

On April 29, 1948, Quality executed another "partial assignment of oil and gas leases" which is in the same form as the prior one and transferred an undivided 70% interest to an additional specified portion of land held by Quality under subleases. Quality retained an undivided 30% interest in the portion of the land covered by the second assignment. The assignment incorporated the operating agreement executed in connection with the prior assignment to Richfield. On the same day the operating agreement was amended to include the additional land.

On July 30, 1948, Quality entered into two contemporaneous agreements with Hancock relating to a different portion of the lands it held under the subleases. The agreements were entitled "PARTIAL ASSIGNMENT OF OIL AND GAS LEASES" and "OPERATING AGREEMENT (carried interest)". They were substantially the same as those entered into between Quality and Richfield except that (1) they applied to a different portion of the land covered by Quality's subleases; (2) the assignment was of a 50% (instead of a 70%) interest with a 50% retained undivided interest; (3) Quality retained a 23½% overriding royalty interest; (4) joint expense, in addition to items similar to those included in the Richfield operating agreement was stated to include $100,000 "in cash as advance royalty hereunder" and the market value of designated steel goods to be delivered to Quality by Hancock, both of which were to be debited to Quality's account and credited to Han-

cock's account and for which Hancock was entitled to reimbursement out of 36.17% of Quality's 23½% overriding interest and its share of net income; and (5) Hancock's right to its share of oil was stated to be subject to Richfield's right to purchase such oil in accordance with Quality's operating agreement with Richfield.

On June 20, 1949, Quality and Hancock entered into a supplemental agreement amending the operating agreement of July 30, 1948, in certain respects bearing on the sale of oil and gas and stating, in paragraph 1, as follows:

"Each of the parties hereto is the owner of an undivided one-half of all oil and gas produced and saved from the joint lands and, subject only to said right of Richfield Oil Corporation to purchase all of the oil and gas produced from said joint lands as hereinabove mentioned, each of the parties hereto has the full right to sell or otherwise dispose of its said one-half of all such oil and gas so produced and saved, and Hancock has no representative authority or capacity to sell or market Quality's one-half share of any part of the oil, gas, or other hydrocarbon substances produced from the joint lands."

On December 30, 1949 Richfield enterd into a written agreement with Quality, appellee Joseph M. Thomas, and other persons having an interest in the properties being operated by Richfield, (referred to collectively as "Quality"), amend the operating agreement of March 17, 1948 as amended by the agreement of April 29, 1948. Paragraph 1 of the amendment reads as follows:

"1. Quality is the owner of an undivided thirty (30) percent and Richfield is the owner of an undivided seventy (70) percent of the lessee's interest under, and the leasehold estates created by, the oil and gas leases described in said operating agreement hereinafter referred to as 'said leases', in so far as said leases cover the lands described in said operating agreement and therein and hereinafter referred to as 'joint lands' and in the oil, gas and other hydrocarbon substances produced and saved from the joint lands under said leases; except oil, gas and/or other hydrocarbon substances reserved as royalty under said leases, or under oil and gas leases or other agreements to which they are subject, and except such oil, gas and/or other hydrocarbon substances as Operator shall not be required to account for under the provisions of paragraph 10 of said operating agreement but subject to the terms, covenants, and conditions of said operating agreement, and each of the parties hereto has the full right to sell or otherwise dispose of its respective share of all oil, gas and/or other hydrocarbon substances produced and saved from the joint lands under said leases and said operating agreement, except such oil, gas and/or other hydrocarbon substances as are so reserved or as Operator shall not be required to account for under the provisions of paragraph 10 of said operating agreement, and Richfield has no representative authority or capacity under said operating agreement to sell, mortgage or otherwise dispose of Quality's thirty (30) percent share of the oil, gas or other hydrocarbon substances produced and saved from the joint lands under said leases and said operating agreement, except that Richfield, as operator under said operating agreement, shall have the right to deliver for the account of Richfield and Quality oil, gas and/or other hydrocarbon substances taken or paid in kind as royalty under said leases, or under any oil and gas lease or other agreements to which said leases are subject."

By paragraph 2 of the amendment Richfield agreed to buy, and Quality agreed to sell, its 30% share of all oil, gas and other hydrocarbon substances produced and saved from the joint lands

at the market value thereof as defined in the original operating agreement.

Paragraph 3 of the amendment states that Richfield had the right to offset against and deduct from the selling price of such 30% share, Quality's 30% share of all joint expenses as defined in the original operating agreement, incurred prior to the end of the calendar month in which sales were made.

By paragraph 6 of the amendment, paragraph 6 of the original operating agreement was amended to provide that Richfield would pay all expenses and that Quality would be personally liable for its share of such expenses only to the extent of the full amount of the proceeds from the sale by Quality of its share of the oil and gas.

By paragraph 9 of the amendment, paragraph 9 of the original operating agreement was amended to provide that Richfield would pay to Quality, on or before the last day of each calendar month, Quality's share of the proceeds after first deducting and offsetting the latter's share of the expenses.

By other paragraphs of the amendment the original operating agreement was amended to substitute, for references to crediting revenue or income to the joint account, reference to Quality's share of oil or the proceeds from its sale to Richfield.

On the 15th day of July, 1950, appellee Joseph M. Thomas and Richfield entered into a "MODIFICATION AGREE-MENT" under which the operating agreement was modified, so far as the interest of such appellee was concerned, to delete paragraphs relating to the assignment of Quality's interest and substitute a provision, as between Richfield and such appellee, requiring any assignment to be of the parties' entire interest or of equal interests in both leases, but permitting a mortgage or pledge as security for debt.

The above described joint ownership of oil and gas rights under said subleases, and the operating agreements with Richfield and Hancock, as amended, remained in full force and effect through the years 1953 and 1954.

The proceeds from production prior to 1953, from both the Richfield and the Hancock operations, exceeded the cost of development and operation expenses incurred prior to 1953.

The disposition of the depletion issue will automatically dispose of other adjustments summarized in the specification of errors relied upon by appellant since all derive from the lower court's holding as to the depletion allowance. The 50% of net income limitation contained in 26 U.S.C. § 114 is not applicable under the facts before us.

Since the issues arising from the relationship between Quality and Richfield are identical to the issues arising from the relationship between Quality and Hancock, we will hereafter confine our discussion to the relationship existing between Quality and Richfield.

This relationship may be summarized as follows: Under the partial assignments of oil and gas leases made by Quality to Richfield, Quality retained an undivided 30% interest in and to the leases covered by said partial assignments and the estates thereby created. Under the December 30, 1949 amendment to the operating agreement Quality was declared to be the owner of a 30% interest under the leasehold estates, and in and to the oil, gas and other hydrocarbon substances produced and saved therefrom.

Under the original operating agreement Richfield was given the sole and exclusive right to explore for, develop, produce and market oil, gas and other hydrocarbon substances recoverable from the joint lands. Under the amendment of December 30, 1949, it was agreed that each of the parties [Richfield and Quality] has the full right to sell or otherwise dispose of its respective share of all the oil, gas and other hydrocarbon substances produced and saved from the lands described in the lease, and that Richfield has no representative authority or capacity to sell or otherwise dispose

of Quality's 30% share, except that Richfield, as operator, has the right to deliver for the account of both parties oil, gas and other hydrocarbon substances taken or paid in kind as royalty under said leases. Under the amendment Richfield agrees to buy and Quality agrees to sell its 30% share at market value as defined in the original operating agreement.

Under the original operating agreement Richfield was required, in the first instance, to pay all joint expenses and was required to credit to the joint account all gross revenues from operations and charge to the joint account all joint expenses, including the sum of $40,000.-00 paid by Richfield to Quality for the interest assigned by Quality to Richfield. The excess of gross revenues over and above the joint expenses is defined as "net proceeds," of which Richfield was entitled to receive 70% thereof and Quality 30% thereof, except that Richfield was entitled to retain, maintain and deduct from Quality's 30% a reserve operating fund of $25,000. Quality was chargeable for interest on the amount of any "net deficit," at the rate of 4% per annum. Quality was not personally liable for joint expenses other than to the extent of its interest in gross revenues and Richfield was required to reimburse itself for joint expenses solely from the joint account. Under the amendment, Richfield has the right to offset against and deduct from the selling price of Quality's 30% share, Quality's 30% share of all joint expenses (including interest on any net deficit) and Quality is to be personally liable for its share of such joint expenses only to the extent of the full amount of the proceeds from the sale of its share of oil and gas. Richfield agrees to pay to Quality Quality's share of such proceeds after deducting and offsetting Quality's share of expenses. References in the original operating agreement to crediting revenue or income to the joint account were changed to references to Quality's share of oil and gas or the proceeds from their sale to Richfield.

The proceeds from production in each of the tax years in question, from both the Richfield and the Hancock operations, exceeded the cost of development and operation expenses incurred in each of said years.

Although the provisions of the Internal Revenue Code of 1939, as amended, are applicable to the tax year of 1953 and the Internal Revenue Code of 1954 is applicable to the tax year of 1954, our references will be to the 1954 Code since the pertinent provisions are, in essence, identical. The applicable provisions of the Internal Revenue Code of 1954 are:

"§ 611. *Allowance of deduction for depletion*

"(a) *General rule.*—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions of each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. * * *

"(b) *Special rules.*—

"(1) Leases.—In the case of a lease, the deduction under this section shall be equitably apportioned between the lessor and lessee.

"* * *"

"§ 613. *Percentage depletion*

"(a) *General rule.*—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. * *

"(b) *Percentage depletion rates.*—The mines, wells, and other natural deposits, and the percentages, re-

ferred to in subsection (a) are as follows:

"(1) 27½ percent—oil and gas wells.

" * * *

"(c) *Definition of gross income from property.*—For purposes of this section—

"(1) *Gross income from the property.*—The term 'gross income from the property' means, in the case of a property other than an oil or gas well, the gross income from mining.

" * * *."

Treasury Regulations on Income Tax (1954 Code):

"Sec. 1.613–3. *Gross Income From The Property.*

"(a) *Oil and gas wells.* In the case of oil and gas wells, 'gross income from the property', as used in section 613(c) (1), means the amount for which the taxpayer sells the oil or gas in the immediate vicinity of the well. If the oil or gas is not sold on the premises but is manufactured or converted into a refined product prior to sale, or is transported from the premises prior to sale, the gross income from the property shall be assumed to be equivalent to the representative market or field price of the oil or gas before conversion or transportation.

" * * *."

The deduction allowance for depletion is in recognition of the fact that minerals in place are wasting assets and the depletion allowance is designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted the owner's capital is unimpaired. Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897 (1938); Kirby Petroleum Company v. Commissioner, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343 (1946); Commissioner v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956); Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959).

The depletion allowance under the statute is limited to 27½% "of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property * * *." Such allowance must be equitably proportioned among the parties having economic interests in the oil and gas in place in accordance with their respective interests. Helvering v. Twin Bell Syndicate, 293 U.S. 312, 55 S.Ct. 174, 79 L.Ed. 383 (1934); Commissioner v. Southwest Exploration Co., supra; Parsons v. Smith, supra.

A taxpayer is entitled to share in the depletion allowance where he has acquired, by investment, any interest in the oil or gas in place, and secured by legal relationship income derived from the extraction of the oil or gas to which he must look for return of his capital. In such case a taxpayer has an "economic interest." Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933); Commissioner v. Southwest Exploration Co., supra; Parsons v. Smith, supra.

The allowance for depletion is not made dependent upon the particular legal form of the taxpayer's interest in the property to be depleted. Palmer v. Bender, supra.

"Economic interest does not mean title to the oil in place but the possibility of profit from that economic interest dependent solely upon the extraction and sale of the oil." Kirby Petroleum Co. v. Commissioner, supra, 326 U.S. p. 604, 66 S.Ct. p. 411, 90 L.Ed. 343.

See also: Commissioner v. Southwest Exploration Co., supra; Burton-Sutton Oil Company v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062 (1946).

The critical question presented by this appeal is whether the appellees for the tax years in question, have an economic interest in the working inter-

est [1] of the leases so as to entitle them to use as a base for the computation of their depletion allowance a proportionate share of gross revenues from the leased lands.

The appellant and the amici oil companies recognize that the appellees have a legal interest or property right in the oil and gas in place under the reserved and retained rights of Quality, and concede that appellees have an economic interest in the oil and gas in place sufficient to support depletion on the proceeds from the sale of oil and gas received by them. They contend that such is the limit to appellees' right of depletion and compare such right to a "net profits" interest [2] in the oil and gas in place. A net profits interest is deemed to be an economic interest in the oil and gas in place. Kirby Petroleum Co. v. Commissioner, supra. See Burton-Sutton Oil Co. v. Commissioner, supra; Commissioner v. Southwest Exploration Co., supra; Grandview Mines v. Commissioner, 282 F.2d 700 (9th Cir. 1960); Commissioner v. Felix Oil Co., 144 F.2d 276 (9th Cir. 1944).

Appellees contend they have a "carried interest" in the oil and gas in place. [3]

In support of such contention appellees rely on the following cases: Reynolds v. McMurray, 60 F.2d 843 (10th Cir. 1932) C.D. 287 U.S. 664, 53 S.Ct. 222, 77 L.Ed. 573; Helvering v. Armstrong, 69 F.2d 370 (9th Cir. 1934); T. K. Harris Company v. Commissioner, 112 F.2d 76 (6th Cir. 1940); Commissioner v. J. S. Abercrombie, 162 F.2d 338 (5th Cir. 1947); Prater v. C. I. R., 273 F.2d 124 (5th Cir. 1959).

While the legal relationship between Richfield and Quality, viewed from the standpoint of property law concepts is, in form, that of co-owners of the working interest in the leases involved,

the Supreme Court in the cases above cited has made it clear that legal title and property law concepts alone are not determinative of the party who has an economic interest in the working interest. In the area of taxation economic realities determine tax consequences.

Under the operating agreement as amended: Richfield was placed in sole and exclusive control of the property; Richfield was obligated throughout the term of the relationship to furnish, in the first instance, all capital for exploration, development and operation of the property; Richfield retained full title to all tangible property; Quality was under no personal obligation to contribute to or bear any portion of such expenditures; Richfield was required to look solely to production proceeds for recoupment of all expenditures, and alone bore the risk and burden if proceeds from production failed to equal expenditures; and Richfield alone benefits from the recoupment of expenditures through production since Quality was under no personal obligation in respect to expenditures.

In our view the substance and effect of the legal arrangement between Richfield and Quality is that Quality assigned to Richfield, at the beginning of the legal relationship, so much of Quality's oil and gas in place as would be needed during the term of that relationship to reimburse Richfield for Quality's portion of the development and operating expenses, and thus retained not an economic interest in the working interests of the leases but in reality only a "net profits" interest. The fact that the proceeds from production in the years in question exceeded the cost of development and operation expenses incurred during those years does not alter the fact that Richfield bore the risk and burden of Quality's share of the expenditures and looked solely to production for recoupment.

1. Mineral interests minus royalty interests.

2. A share of gross production measured by net profits from the operation of the property.

3. An arrangement between two or more co-owners of a working interest, whereby one agrees to advance all or some part of the

development costs on behalf of the others, and to recover such advances from future production, if any, accruing to the other owners' share of the working interest. See Estate of H. H. Weinert, et al. v. Commissioner, 294 F.2d 750 (5th Cir. 1961).

We concede that the holdings in the cases relied upon by appellees support their contentions.

The holdings in McMurray, Armstrong and Harris are based primarily, if not wholly, upon property law concepts, and the opinions in those cases give no consideration to the "economic interest" concept as developed in many of the Supreme Court cases above cited. Likewise Abercrombie and Prater rely upon property law concepts and resort to legal fictions which were severely criticized by a recent decision of the same Circuit,[4] and their precedential value was largely undermined.

We are in no position to overrule any of the cases relied upon by appellees except the Armstrong case. We believe that the vitality of that case has been sapped by the above cited decisions of the Supreme Court and we expressly overrule the decision in Armstrong.

The judgment of the District Court is reversed.

CHAMBERS, Circuit Judge (dissenting):

I would affirm.

Before Southwest Exploration, 350 U. S. 308, 76 S.Ct. 395, 100 L.Ed. 347, I would have unhesitatingly concurred in the foregoing opinion.

In this field of depletion we deal with a deduction that has only an occasional accidental relation to the cost of or investment in a wasting asset. The justification for this special consideration is said to be that we must do it to encourage the risk taking necessary to make and keep our country big and strong. I am not wise enough (and it is none of our business) to condemn the law. As a citizen, I think I would favor something like the present law.

But believing that the purpose of the depletion provisions of the Internal Revenue Code was to encourage the man (or the company) to put his money in the hole in the ground was what led me to concur in our opinion in Commissioner v. Southwest Exploration Co., 9 Cir., 220 F.2d 58, in favor of the oil company which did the drilling to the exclusion of him with no oil but who had an access road and the onshore drilling site to reach the offshore oil. But I was wrong.

To me, the Quality Oil (the Thomases), interest as a speculator gave it the same percentage of economic interest in the oil as if it (or they) had been personally liable for development and operating costs. Thus, I would not hold the Thomases down to depletion on their net profits, but would let them share the depletion on the difference between the net profit and the gross profit.

If I am wrong again, and that is the evidence today, I am not unhappy with the majority's result.

---

4. Estate of H. H. Weinert, et al. v. Commissioner, supra.