**CALLAHAN MINING CORPORATION
and Subsidiary, Pinnacle Exploration,
Inc., Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellee.**

**CALLAHAN MINING CORPORATION
and Subsidiary, Pinnacle Exploration,
Inc., Cross-Appellees,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Cross-Appellant.**

**Nos. 678–679, Dockets 34070, 34166.**

United States Court of Appeals,
Second Circuit.

Argued May 20, 1970.

Decided June 29, 1970.

Robert H. Preiskel, New York City (Strasser, Spiegelberg, Fried & Frank, Richard O. Loengard, Jr., Daniel C. Schaffer, New York City, of counsel), for petitioners-appellants-cross-appellees.

Bennet N. Hollander, Atty., Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Grant W. Wiprud, Attys., Dept. of Justice, Washington, D. C., of counsel), for the Commissioner.

C. Rudolf Peterson, Thomas E. Jenks, George W. Beatty, Washington, D. C., submitted a brief for American Smelting and Refining Company, as amicus curiae.

Before SMITH and HAYS, Circuit Judges and BARTELS, District Judge.[*]

HAYS, Circuit Judge:

This appeal concerns the proper allocation of the percentage depletion deduction between the lessor and the lessee of certain mining property. The Tax Court determined that an allocation of the depletion deduction to the lessor, appellant Callahan Mining Corporation, based upon the fifty percent share of net profits payments which it received under the terms of the lease represented an "equitable apportionment" satisfying the mandate of the relevant provision of the Internal Revenue Code of 1954, § 611(b) (1). Callahan contends that its depletion deduction should be based upon fifty percent of the total gross income from the property. We find no reason to disturb the determination of the Tax Court,[1] and accordingly, we affirm its decision that there are deficiencies due from appellant for the years 1959, 1960 and 1961 in the amounts of $112,585.06, $76,469.-34 and $114,494.56, respectively.

## I.

The following summary of the facts as found by the Tax Court, 51 T.C. No. 1005 (March 24, 1969), is sufficient for an understanding of the issue involved in this case.

On January 15, 1947, appellant Callahan entered into a lease agreement with American Smelting and Refining Company (ASARCO) with respect to certain contiguous patented and unpatented lode claims in the Coeur d'Alene District in Northern Idaho. These claims, known as the Galena mining property, had been acquired by appellant in the early 1920's, and between 1922 and 1938 appellant had expended substantial sums on exploration and development of the property in an unsuccessful attempt to achieve commercial production. In 1946, after a period of inactivity at the mining property, independent engineers hired by appellant conducted an examination of the property's potential. Their report indicated that, in view of recently discovered valuable deep ore bodies in the vicinity of the Galena mining property, a deep exploration program was warranted, but that such a program would involve a substantial financial risk. Appellant, either unwilling or unable to undertake the risk itself, began negotiations with several major mining companies in an effort to secure outside financing. The lease agreement entered into with ASARCO was the result.[2]

---

[*] Of the Eastern District of New York, sitting by designation.

1. In view of our decision it is unnecessary for us to reach the issues raised on the Commissioner's "protective" cross-appeal and the cross-appeal is therefore dismissed.

2. The original lessor under the lease agreement was Vulcan Silver-Lead Corporation, a wholly owned corporation organized by Callahan for the purpose of holding the property leased to ASARCO. At the time of the transfer of the Galena mining property to Vulcan, appellant's investment in the property amounted to approximately $1,555,475.50. Vulcan was merged into appellant in 1958.

The lessee ASARCO assigned one-quarter of its interest in the leased prop-

Under the terms of the lease agreement, ASARCO was granted the exclusive right to explore, develop and operate the Galena mining property for a term of 30 years with an option to renew for an additional 30 years. After completion of certain specified work on which ASARCO was required to expend no more than $600,000, ASARCO had the right to terminate the lease upon thirty days written notice. If it did not elect to terminate the lease, ASARCO was obligated to continue "with reasonable diligence" the exploration and development of the property; however, all exploratory, development and operational work was to be undertaken only as ASARCO "in its sole judgment" deemed advisable for the benefit of the enterprise. All moneys required for such work, including working capital, were to be advanced by ASARCO. ASARCO was also required to pay all taxes upon the property and to reimburse Callahan for any taxes paid by it.

Net profits [3] were to be applied first to reimburse ASARCO for its advances or expenditures in connection with the exploration, development and operation of the mining property and then to establish and maintain a working capital fund of $500,000. Article 14 of the lease agreement provided that any net profits in excess of those required to satisfy the foregoing requirements were to be divided "equally between the Lessor and the Lessee." Until such time as the lessor Callahan was entitled to share in the net profits of operations, ASARCO was required to pay royalties to Callahan on all ores and concentrates produced and sold in an amount equal to ten percent of the net smelter or mill returns.[4] However, these royalties were to be not less than fifty cents per ton of crude ore.

If, after the profit-sharing provision had become operative, Callahan's share of net profits during any calendar quarter fell below fifty cents per ton of crude ore produced, Article 17 required ASARCO to advance to Callahan the difference between Callahan's share of net profits for the quarter and the sum of fifty cents per ton of crude ore. These advances were chargeable against Callahan's share of net profits in any future calendar quarter to the extent that such share exceeded fifty cents per ton of crude ore, but Callahan was not otherwise liable for the repayment of the advances.

Finally, in Article 29, the lease agreement provided that upon termination of the lease ASARCO was required to surrender the property and to pay all bills and other obligations incurred in connection with its development and operation including all royalties and profits due to Callahan up to the date of termination. To the extent that ASARCO had not been fully reimbursed for expenditures made by it under the terms of the contract, including advances to Callahan under the provisions of Article 17, the working capital fund, including all equipment, material and supplies, was to be applied to satisfy ASARCO's claims. Any remaining amount in the working capital fund was to be divided equally between Callahan and ASARCO.

Since 1947, ASARCO has operated the Galena mining property under the terms of the lease agreement with its own employees and management team, expending substantial amounts in exploration, development and equipment. The operation began to show a profit in 1955, and by January 1959, sufficient net profits had been generated to reimburse ASARCO for its prior expenditures (to-

---

erty to Fern Mining Company, which in turn assigned the interest to Day Mines, Inc., its present owner.

3. Net profits were determined by deducting from the net proceeds of crude ores, concentrates and other products of the property, the total expenses of operating

the property, including royalties and taxes but not depletion or depreciation.

4. Net smelter or mill returns were defined as the net amount received from the smelter or mill for ores or concentrates less costs of transportation and smelter or mill charges.

talling $3,641,079) and to establish the $500,000 working capital fund. Since that time and during the years 1959–1961 here in issue, appellant and ASARCO have divided net profits equally. During late 1959 and early 1960, because of a strike at the smelters, ASARCO advanced approximately $800,000 over and above the $500,000 working capital account in order to keep the mine in operation. These advances were subsequently recovered from net profits.

On its federal income tax returns for the years 1959, 1960 and 1961, appellant computed and claimed percentage depletion deductions based on fifty percent of the total gross income of the Galena mining property. The Commissioner ruled that appellant was entitled to depletion deductions based only on the amounts it actually received from ASARCO as its share of net profits.[5] Appellant filed a petition for redetermination in the Tax Court. The Tax Court held adversely to appellant, determining deficiencies due for the taxable years 1959, 1960 and 1961 in the amounts of $112,585.06, $76,460.34 and $114,494.56, respectively.[6]

## II.

Section 611(a) of the Internal Revenue Code of 1954 authorizes, as a deduction in computing taxable income from mines and other natural deposits, a "reasonable allowance for depletion * * * according to the peculiar conditions in each case * * *." The allowable deduction in the case of metal mines is 15 percent of the "gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property." Int.Rev.Code of 1954, § 613(a), (b) (3). In the case of a lease, Section 611(b) directs that the deduction "shall be equitably apportioned between the lessor and the lessee."

The Tax Court, having examined the lease agreement between ASARCO and appellant, concluded that "Under the circumstances of this case * * * an allocation of the depletion deduction to [Callahan] based upon the amounts it actually received best satisfies the mandate of equitable apportionment under Section 611(b) (1)."

A taxpayer may share in the depletion allowance only to the extent that he has an economic interest in the extraction and sale of the mineral for which depletion is claimed. See CIR v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956); Palmer v. Bender, 287 U.S. 551, 557, 53 S.Ct. 225, 77 L.Ed. 512 (1933). Thus the central inquiry, in apportioning the depletion deduction between the parties to a lease agreement, is whether a party has "an economic interest in the working interest," see United States v. Thomas, 329 F.2d 119, 130 (9th Cir.), cert. denied, 379 U.S. 819, 85 S.Ct. 39, 13 L.Ed.2d 31 (1964), supporting a deduction for depletion based on the gross income from the property, or has merely an economic interest in the ore in place, a nonoperating interest supporting depletion deductions based only on the amounts actually received by the party as the resource is extracted and sold. See Burton-Sutton Oil Co. v. CIR, 328 U.S. 25, 35, 66 S.Ct. 861, 90 L.Ed. 1062 (1946); Kirby Petroleum Co. v. CIR, 326 U.S. 599, 604–605, 66 S.Ct. 409, 90 L.Ed. 343 (1946); Helvering v. Mountain Producers Corp., 303 U.S. 376, 382, 58 S.Ct. 623, 82 L.Ed. 907 (1938). In determining what constitutes an equitable apportionment, the courts have focused on the question of who bears the financial bur-

5. Appellant received payments of $534,501 in 1959, $586,047 in 1969 and $838,778 in 1961.

6. On its federal income tax returns for the years 1959, 1960 and 1961, ASARCO claimed depletion deductions based on the total gross income from the Galena mining property, less payments to petitioner and $250,000 of the working capital account. The Commissioner subsequently disallowed depletion claimed by ASARCO to the extent that such depletion, when added to the depletion allowed to petitioner, would exceed 15 percent of the total gross income from the Galena mining property.

dens of development and operation. See, e. g., United States v. Cocke, 399 F.2d 433, 445–447 (5th Cir. 1968), cert. denied, 394 U.S. 922, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969). See generally, Galvin, The "Ought" and "Is" of Oil-and-Gas Taxation, 73 Harv.L.Rev. 1441, 1492–95 (1960). Applying these principles in a line of cases, the Ninth Circuit has held that where the lessee has sole control over operations, furnishes all the capital for exploration and development, and is solely liable for the loss if the operation should prove unprofitable, the lessor retaining an economic interest in the depletable resource holds essentially a net profits, non-operating, interest and is entitled to depletion only on the amounts he actually received as the ore is mined and sold. See United States v. Thomas, *supra*; Grandview Mines v. CIR, 282 F.2d 700 (9th Cir. 1960); CIR v. Felix Oil Co., 144 F.2d 276 (9th Cir. 1944).[7]

The Tax Court relied on this line of decisions in reaching its conclusion that appellant was entitled to percentage depletion only on the amounts it actually received. While we do not necessarily indicate agreement with all that was said in the Ninth Circuit's opinions, we believe that the result reached is a correct one and approve its application to the facts of the instant case.

### III.

The incidents of the relationship between ASARCO and appellant strongly suggest that appellant's economic interest in the Galena mining property was a non-operating interest limited to the net profit payments it actually received. Under the terms of the lease agreement, ASARCO had sole control of and was ob-ligated to advance all capital necessary for the development and continued operation of the Galena mining property. Appellant was not liable for any part of those expenditures,[8] and ASARCO could look only to net profits for reimbursement.

Appellant itself appears to have interpreted the lease as giving it a net profits interest. During the course of negotiations, appellant's representatives wrote a letter to ASARCO stating their understanding that the lease would entitle ASARCO to a depletion deduction based on gross income less payments to appellant, while appellant's depletion allowance would be based on net profit payments received by it. Appellant suggested the inclusion of language indicating that the depletion allowance was to be divided equally between the parties, a proposal ASARCO rejected.[9] Additional evidence of appellant's understanding with regard to the interest it retained under the lease agreement appears in its Annual Reports for 1959 and 1960, where its interest in the Galena mining property is characterized as "essentially 50 percent of the operating cash flow from the operation."

Appellant, however, now urges that it had considerably more than a net profits interest in the Galena mining property. Appellant points to the $500,000 working capital fund as the central feature of the lease agreement which distinguishes it from the typical net profits arrangement. The working capital fund, argues appellant, provided ASARCO with a financial "cushion" against loss which, when considered in conjunction with ASARCO's right to terminate the lease

---

7. The Tax Court has followed the Ninth Circuit cases. See, e. g., Byron H. Farwell, 35 T.C. 454 (1960).

8. During the last quarter of 1960, when expenses exceeded current income, 50% of the resulting loss was charged against appellant's account. Appellant cites this as evidence that it shared in the losses of the operation and therefore should be considered as having a depletable interest in gross income from the property. These bookkeeping entries appear more likely to have been intended as a method for keeping track of the amount ASARCO was entitled to recoup from future profits on account of past losses. Appellant was never actually liable for the amounts debited to its account.

9. Of course, the inclusion of such language would not have been binding on the Commissioner.

at will, effectively reduced ASARCO's risk to a minimum. Since its own interest in the fund was at stake in the event that the lease should be terminated during a period when the mine was operating at a loss, appellant concludes that in reality, to the extent that there were financial risks in the operation of the successful Galena mine, it shared in them equally with ASARCO.

Thus appellant claims that, since it shared the working interest in the Galena mining property with ASARCO, it is entitled to a depletion deduction based on the entire gross income from the property. The Tax Court, however, found that the existence of the $500,000 working capital fund, along with the termination provision, did not significantly affect the economic realities of the lease arrangement between ASARCO and appellant and accordingly determined that it was equitable to allow appellant percentage depletion only on the amounts it actually received.

 The issue raised by appellant's argument, as to what sharing of risks might so shift the economic relationships under the lease agreement that it would be equitable to apportion the depletion allowance equally between the parties, is not without difficulty. Nevertheless we believe that the question of what constitutes an equitable apportionment of the depletion allowance is one of those mixed questions of fact and law where decision is so tied to the fact-finder's assessment of the proper interplay between the various factual elements and a fairly non-technical statutory standard that "primary weight" should be given to the fact-finder's conclusions. See CIR v. Duberstein, 363 U.S. 278, 289, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

There is ample support for the Tax Court's determination. Appellant's risk in the working capital fund was limited to profits generated by mining operations. ASARCO, on the other hand, remained liable, even after the fund was exhausted, for all obligations incurred by it in connection with the development and operation of the mining property, and it could not escape this liability by termination of the lease agreement.[10] Moreover, we believe it preferable to view the lease as an arrangement to govern an on-going enterprise. Appellant's interest in the fund was at risk only in the event that the lease was terminated during a period when the mine was operating at a loss. As against this contingent and limited risk, appellant was at all times, regardless of the current profitability of the enterprise, guaranteed a minimum return of fifty cents per ton of ore mined. This continuing royalty feature in particular strongly supports the conclusion that appellant's economic interest in the Galena mining property was essentially a non-operating interest, not dependent on the over-all profitability of the enterprise, but merely on the extraction and sale of the ore in place.

The decision of the Tax Court is affirmed.

10. A termination provision is not uncommon in net profit leases. See the original operating agreement at issue in United States v. Thomas, 329 F.2d 119, 123–125 (9th Cir.), cert. denied, 379 U.S. 819, 85 S.Ct. 39, 13 L.Ed.2d 31 (1964), which also contained a $25,000 "reserve operating fund" similar in function to the $500,000 working capital fund in this case.