CALLAHAN MINING CORPORATION & SUBSIDIARY, PINNACLE EXPLORATION, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4231–66.   Filed March 24, 1969.

*Robert H. Preiskel, Richard O. Loengard, Jr.,* and *Robert M. Rosier,* for the petitioner.[1]

*James Q. Smith,* for the respondent.

---

[1] C. Rudolf Peterson, Thomas E. Jenks, and George W. Beatty, for *amicus curiae* American Smelting & Refining Co.

TANNENWALD, *Judge:* Respondent determined deficiencies in the Federal income tax of petitioner as follows:

| Taxable year | Amount |
| --- | --- |
| 1959 | $189,595.11 |
| 1960 | 80,275.16 |
| 1961 | 120,598.96 |

After various concessions by the parties, the principal issue remaining for decision is the determination of the proper method for computing petitioner's "gross income from mining" for purposes of percentage depletion. A subsidiary issue involves the treatment by petitioner in computing its "gross income from mining" of State net profits taxes paid for the years in question.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Callahan Mining Corp. (hereinafter referred to as petitioner) is an Arizona corporation with its principal office and place of business in New York, N.Y., at the time the petition herein was filed. Petitioner filed its consolidated income tax returns for the calendar years 1959 and 1960 and its separate income tax return for the year 1961[2] on an accrual basis with the district director of internal revenue, Manhattan, New York.

Petitioner's business included, among other things, the ownership, development, and operation of mining properties on its own behalf in the Rocky Mountain area of the United States and in several Canadian provinces.

During the early 1920's, petitioner acquired a number of contiguous patented and unpatented lode claims in the Coeur d'Alene District in northern Idaho (hereinafter referred to as the Galena property) and promptly embarked upon an exploration program of such property in an attempt to make it commercially productive. Substantial sums were expended during the period 1922 to 1932. Petitioner's activities during this period included sinking of the main Galena mine shaft to a depth of 800 feet, sinking an internal shaft an additional 1,000 feet to open the lower levels, and substantial underground work amounting to several thousand feet.

---

[2] The consolidated Federal income tax returns for the years 1959 and 1960 were filed by petitioner, as common parent, with Pinnacle Exploration, Inc., and Livengood Placers, Inc., subsidiaries in which petitioner owned more than 80 percent of the outstanding voting stock. Petitioner's stockholders in Pinnacle and Livengood were decreased below 80 percent on Jan. 19, 1961, and Jan. 20, 1961, respectively. Both corporations were, therefore, members of the affiliated group for less than 31 days during the taxable year beginning Jan. 1, 1961, and each elected under sec. 1.1502–13(f), Income Tax Regs., to be considered as not having been a member of the affiliated group during any part of that taxable year.

In 1932, petitioner's management, faced with low metal prices and limited financial resources, suspended all work on the property. During 1937, petitioner again reopened the mine, and exploration work continued until 1938. This work indicated that a program to explore the potentialities of this property would involve outlays substantially in excess of petitioner's financial capacity. As a result, the Galena mine was closed again and remained inactive through 1945.

During the period from 1922 through 1938, underground work conducted by petitioner on the Galena property amounted to more than 34,000 feet and resulted in the production of 136,149 tons of low-grade ore, which was milled on the property at a loss.

In 1946, independent engineers hired by petitioner conducted a thorough examination of the Galena property. In their report to petitioner, they indicated that considerable risk would be involved in a deep exploration program but that, in view of the recently discovered valuable deep ore bodies in the vicinity of the Galena property, such risk would be warranted for those who could afford the loss if the work were to ultimately prove unsuccessful. Since, at that time, petitioner was either unwilling or unable to incur the substantial risk and expense of a deep exploration program, it commenced discussions with several major mining companies with a view towards securing outside financing for the development of the Galena property. Following extensive negotiations, the terms of a lease with American Smelting & Refining Co. (hereinafter referred to as ASARCO) were tentatively agreed upon, under which petitioner, after a certain point in time, would receive 50 percent of the net profits. Initially such lease was to cover only the western two-thirds of the Galena property.

During the course of the negotiations with ASARCO, petitioner's representatives wrote a letter to ASARCO's representatives stating that, as they understood the proposed lease agreement, ASARCO would be entitled to depletion of 15 percent of the gross income less payments to petitioner on account of profits, while petitioner's depletion would be limited to 15 percent of those profits. Petitioner suggested that a new paragraph be added to the proposed lease agreement to the effect that, after the parties began to share the net profits on a 50–50 basis, they would apportion the depletion allowance equally between them. Such proposal, however, was rejected by ASARCO's representatives and was not included in the lease agreement as executed.

On May 31, 1946, petitioner organized Vulcan Silver-Lead Corp. (hereinafter referred to as Vulcan) under the laws of the State of Idaho to hold that portion of the Galena property to be made subject to the lease agreement with ASARCO. Thereafter, on June 22, 1946,

Vulcan received some 72 mining claims from petitioner, consisting of the western two-thirds of the Galena property, in exchange for 1,500,-000 shares of Vulcan stock, constituting its then entire issued and outstanding capital stock. These claims became the nucleus of the property subjected to the lease with ASARCO (hereinafter referred to as the Galena mining property). Petitioner retained direct ownership of the remaining one-third of the Galena property. Subsequently, additional claims were acquired by Vulcan and thereafter included in the lease with ASARCO. At the time of the transfer to Vulcan, petitioner's aggregate investment in the Galena mining property (including the cost of acquisition and development expenditures) approximated $1,555,475.50.

As of January 15, 1947, Vulcan entered into a lease agreement with ASARCO (hereinafter referred to as the agreement) with respect to the Galena mining property. Pursuant to the agreement, ASARCO was granted the exclusive right to explore, develop, and operate the Galena mining property for a term of 30 years with an option to renew for an additional 30 years. The relevant provisions of the agreement are as follows:

Article 3. Possession and Control of Property.

The Lessor hereby gives and grants to the Lessee the right immediately to enter upon and take over the sole and exclusive possession and control of the property * * * and during the effective term of this lease the Lessee shall remain in the sole and exclusive possession and control thereof. The Lessee is also granted the right to * * * develop, work, mine, operate, use, manage and control said property; * * * and to mine, extract and remove from said property the ores and minerals contained therein and to treat, mill, ship, sell or otherwise dispose of the same and receive the full proceeds therefrom, subject to the terms and conditions hereinafter set forth.

    *       *       *       *       *       *       *

Article 5. Work Requirements.

A. The Lessee further agrees (a) to take immediate possession of the property, (b) to proceed promptly with preparations necessary for the exploration thereof, (c) to pay all taxes levied against the property as provided in Article 22, * * * and (e) subject to the terms and conditions hereof, to sink a shaft on the property approximately to sea level and to drift or cross-cut at about that elevation to an exent which shall be not less than a total of five thousand (5,000) feet, all in manner, method and location as determined in the sole judgment of the Lessee; and the Lessee further agrees to advance all moneys required in connection with the performance of all such agreements. Such work shall be prosecuted diligently, * * * and the Lessee shall be reimbursed therefor as provided in Article 14.

B. It is expressly stipulated and agreed, however, that the Lessee shall not be required to expend more than Six Hundred Thousand Dollars ($600,000) in and about the shaft and drifts or cross-cuts referred to in clause (e) of paragraph A of this Article, the work in connection therewith, and the necessary buildings and equipment, and further that, anything herein to the contrary not-

withstanding, there shall be no obligation hereunder on the part of the Lessee to commence or continue any of the work requirements specified in said paragraph A if the Lessor shall be unable within a reasonable time (a) to perfect its titles to all of said unpatented lode mining claims as unpatented claims, by relocation or otherwise, as Lessee may reasonably require, or (b) if in the course of Lessee's operations hereunder heavy ground or excessive water, or the like, shall be encountered and if such conditions shall render the undertaking economically unsound or impracticable according to generally accepted good mining practice.

Article 6. Termination by Lessee.

The Lessee reserves the right hereby expressly granted by the Lessor to terminate this lease and surrender the property to the Lessor during the term hereof (a) at any time after the sinking of said shaft to sea level and completion of five thousand (5,000) feet of drifting or cross-cutting, or (b) at any time after the Lessee shall have expended a minimum of Six Hundred Thousand Dollars ($600,000) in connection with such work, or (c) at any time that the continuation of such work shall become economically unsound or impracticable as provided in Article 5, or (d) for any reason whatever at any time during the term or extended term hereof upon fulfilment of the covenants contained in clauses (a) and (b) of this Article, upon thirty (30) days written notice to the Lessor of intention to do so.

Article 7. Mining Operations.

Upon completion of the shaft and drifting or cross-cutting prescribed in Article 5 the Lessee (unless this lease shall be terminated under Article 6) shall continue with reasonable diligence the exploration and development of the property, placing thereon or at other suitable location within a reasonable time all such additional mining, milling and other equipment, buildings, etc. of the kind, type, character and quality deemed advisable in the Lessee's sole judgment, advancing all moneys required for that purpose including working capital, subject, however, to the right of the Lessee to be reimbursed therefore as hereinafter provided in Article 14.

Article 8. Additional Work.

Nothing herein contained shall be construed to prevent the Lessee from conducting any and all such exploratory, development or mining work on the property as may seem advisable to the Lessee in its sole judgment for the benefit of the enterprise, advancing all moneys required in connection therewith; and the Lessee shall be entitled to reimbursement as provided in Article 14 for all capital expenditures in connection therewith, including all expenditures made before the property shall be placed on a profitable operating basis, operating expenditures made thereafter to be deducted in the determination of net profits under Article 15 hereof.

    \*       \*       \*       \*       \*       \*       \*

Article 10. Treatment of Product.

The Lessee shall have the right to purchase and to treat all direct smelting ores and concentrates produced from the property at any of its smelters, \* \* \*.

Until such time as the production of milling ores shall warrant in Lessee's sole judgment the installation of a mill on the property or at other suitable location and such mill shall be placed in operation, the Lessee shall have the right to purchase and to treat all milling ores produced from the property at any of its mills, \* \* \*.

Article 11. Royalties.

A. Royalty Period.

The Lessee shall pay to the Lessor the royalties prescribed in paragraphs B and C of this Article until such time as the Lessor shall become entitled to share in the profits of operations as provided in Article 14; * * *.

B. Royalties on Ores, Concentrates and Tailings.

The Lessee shall pay royalties on all ores and concentrates produced and sold in an amount equal to ten per cent (10%) of the net smelter or mill returns therefrom as hereinafter defined, which royalties however shall be not less than fifty cents (50¢) per ton of crude ore; and if in addition to ores and concentrates there shall be shipped from the property tailings or similar products the Lessee shall pay to the Lessor as royalty thereon an amount equal to ten per cent (10%) of the net returns from the sale thereof to mill or smelter or other consumer, less transportation charges.

C. Royalties on Premiums and Subsidies.

In addition to the royalties aforesaid the Lessee shall pay a royalty of ten per cent (10%) on all premiums and subsidies on ores mined and removed from the property, except where by law or government regulations such premiums or subsidies or any part thereof are excluded from the computation of royalties.

Article 12. Advance Royalties.

As an advance on account of the royalties payable under Article 11 the Lessee has paid to the Lessor the sum of Four Thousand Five Hundred Dollars ($4,500), the receipt of which is hereby acknowledged; and to provide for the corporate expenses of the Lessor the Lessee agrees to further advance on account of said royalties (on the 25th day of each month) the sum of Five Hundred Dollars ($500) per month from the date hereof (a) until such time as Lessee may elect to terminate this lease as provided in Article 6(a), Article 6(b), and Article 6 (c), or (b) until royalties shall be due and payable hereunder, whichever event shall occur first, provided, however, that if such royalties shall be less than Five Hundred Dollars ($500) per month the deficiency if any for the applicable quarter shall be advanced by the Lessee against royalties thereafter payable hereunder; and provided further, that all royalties in excess of One Thousand Five Hundred Dollars ($1,500) per quarter shall be retained by the Lessee until it shall have been fully reimbursed for royalties advanced hereunder.

Article 13. Net Smelter Returns.

The term "net smelter returns" shall be interpreted to mean the net amount received from the smelter in payment for direct smelting ores and concentrates less cost of transportation from the mine to the smelter and smelter charges.

Net Mill Returns.

The term "net mill returns" shall be interpreted to mean the net amount received from the mill in payment for ores milled, less cost of transportation from the mine to the mill and mill charges.

Article 14. Application of Profits.

Any and all net profits derived and determined as provided in Article 15 hereof shall be applied, first, to reimburse the Lessee for its advances or expenditures under Articles 5, 7, 8, 9, 17, 22, 23, 25, and 33 hereof (if any, not otherwise deducted in determining net profits), and second, to establish and maintain working capital in addition to that provided by the Lessee under Article 7 and in the total sum of Five Hundred Thousand Dollars ($500,000) (which

shall be subject to increase or decrease from time to time by mutual agreement). Any such profits as may be in excess of the foregoing requirements shall be divided equally between the Lessor and the Lessee.

Article 15. Determination of Net Profits.

"Net profits" shall be determined by deducting total expenses of whatsoever nature in connection with the operation of the property including royalties under Article 11 from the net proceeds of the crude ores and/or concentrates and other products of the property, but without deduction for depletion or depreciation; and such total expenses shall include also * * *.

*      *      *      *      *      *      *

(d) All taxes, assessments and governmental charges lawfully imposed upon the property or any part thereof, the operations conducted hereunder, or the sale of the product, * * * other than those for which the Lessee shall be entitled to reimbursement as provided in Article 22, and other than Federal and Idaho income taxes, net profits taxes (except property taxes based on net profits), and taxes of a similar nature, levied by such governmental instrumentality * * * upon the Lessor or the Lessee and which shall be for the account of the party directly responsible therefor.

Article 16. Losses in Operation.

Any loss sustained in the operation of the property during any month shall be a charge upon first net profits thereafter derived.

Article 17. Additional Advances.

If, after the Lessee shall have been reimbursed and working capital shall have been established and maintained as provided in Article 14, it shall become necessary at any time for the Lessee in its sole judgment to advance additional funds for capital expenditures in excess of those referred to in Article 26, or to continue operations when working capital shall be depleted or exhausted, the amount of such advances shall be repaid to the Lessee out of the first profits thereafter derived with interest thereon at the rate of five per cent (5%) per annum; and if and when the Lessee shall have been so reimbursed with interest and thereafter working capital shall have been established again in the amount prescribed in Article 14, profits shall then be divided equally between the Lessor and the Lessee; provided, however, that if the Lessee shall elect to make advances hereunder to continue operations at a loss to the mine, there shall be paid to the Lessor during such period a royalty of fifty cents (50¢) per ton of crude ore produced from the property and sold or otherwise disposed of, it being expressly stipulated and agreed that such payments and losses by the Lessee shall constitute an advance or expenditure for which it shall be entitled to reimbursement as hereinabove provided.

*      *      *      *      *      *      *

Article 22. Payment of Taxes.

The Lessee shall pay or if the Lessor shall have paid the Lessee shall reimburse the Lessor for all taxes upon said property falling due during the term of this lease and while the same is in force and effect * * * and shall also pay, * * * all taxes levied or assessed against any and all personal property, machinery and equipment placed upon said property by the Lessee during the term of this lease. The Lessee shall be liable for and undertakes to pay all sales taxes and other taxes of every kind, character and description levied or imposed during the term of this lease upon the ores, minerals, concentrates or products of ores

produced, sold or otherwise disposed of by the Lessee * * * and the Lessee shall be entitled to reimbursement for all taxes paid hereunder as provided in Article 14 until the property shall be placed on a profitable operating basis when the same shall be deducted in determining net profits as provided in Article 15. * * *

Article 26. Replacements.

If at any time during the period of this lease capital expenditures shall be required in the Lessee's sole judgment for the benefit of the operations contemplated herein, in addition to those made before the property shall be placed upon an operating basis * * * the parties hereto agree that any such capital expenditures in an amount not exceeding in the aggregate Seventy-Five Thousand Dollars ($75,000) in any one calendar year shall be deemed expenses in connection with the operation of the property and as such shall be deducted in determining "net profits" as provided in Article 15 hereof.

    *       *       *       *       *       *       *

Article 29. Surrender of Property.

Upon termination of this lease * * * the Lessee shall * * * surrender possession of the property and pay all bills or other obligations incurred by it in connection therewith and all royalties or profits due to the Lessor up to the date of such termination.

In the event that such termination shall occur before the property is placed upon a profitable operating basis, the Lessee shall have the right to remove from the property the equipment, materials and supplies placed thereon by it, subject, however, to the right of the Lessor to purchase [certain of the equipment, materials and supplies on the basis of cost].

In the event, however, that such termination shall occur after the property shall have been placed upon a profitable operating basis but before the Lessee shall have been fully reimbursed for its expenditures * * * then any cash available in the working capital account shall be applied to so reimburse the Lessee, and the Lessee shall have the further right to remove from the property equipment, materials and supplies of a fair market value not exceeding the amount required for such reimbursement, subject, however, to the right of the Lessor to purchase any of such equipment, materials and supplies at the then fair market value thereof.

If, however, the Lessee shall have been previously so fully reimbursed, or shall be so fully reimbursed through the application of working capital as hereinabove provided, then the amount of any remaining working capital shall be divided equally between the Lessor and the Lessee, and for that purpose the equipment, materials and supplies remaining on the property shall be sold or otherwise disposed of on the basis of the best terms available.

Subsequently, by an agreement dated June 4, 1959, article 17 of the agreement was amended to read as follows:

Article 17. Additional Advances.

(a) If, after the Lessee shall have been reimbursed and working capital shall have been established and maintained as provided in Article 14, it shall become necessary at any time for the Lessee in its sole judgment to advance additional funds for capital expenditures in excess of those referred to in Article 26, or to continue operations when working capital shall be depleted or exhausted, the

amount of such advances shall be repaid to the Lessee out of the first profits thereafter derived with interest thereon at the rate of five per cent (5%) per annum; and if and when the Lessee shall have been so reimbursed with interest and thereafter working capital shall have been established again in the amount prescribed in Article 14, profits shall then be divided equally between the Lessor and the Lessee.

(b) Notwithstanding the provisions of Articles 16 and 17(a), if, during any calendar quarter in which the property has been operated by the Lessee, there are no net profits, or the share of net profits payable in cash to the Lessor is less than 50 cents per ton of crude ore produced from the property and sold, removed from the property or milled at the property during such quarter, then, for such calendar quarter, the Lessee shall pay to the Lessor, as an advance against the Lessor's share of future net profits, a sum equal to the difference between (1) the Lessor's share of net profits (if any) for said quarter and (2) the sum of 50 cents per ton of said crude ore; (but not more than 50 cents per ton). Such advances to the Lessor shall be chargeable against and deducted from the Lessor's share of net profits in any future calendar quarter to the extent that such share exceeds a minimum of 50 cents per ton of crude ore produced from the property and sold, removed from the property or milled at the property during such quarter, until all such advances have been deducted in full. Except by charge against and deduction from the Lessor's share of future net profits as aforesaid, the Lessor shall not be liable to repay Lessee for such advances. * * * In the event of termination of this lease with any advances by the Lessee under this Article 17(b) still outstanding, the same shall be regarded as expenditures for which Lessee shall be entitled to reimbursement under the provisions of the third paragraph of Article 29 hereof.

Since 1947, ASARCO has continued to operate the Galena mining property under the agreement with its own employees and management team.[3] The ores mined from the Galena mining property by ASARCO have been sent to ASARCO's smelters and refineries and the resulting products have been sold by it to third parties. Since 1947, petitioner has never received any of the ores or concentrates in kind.

In operating the Galena mining property, ASARCO has continued to use the same two shafts originally constructed and used by petitioner; however, ASARCO extended the depths of the original shafts to lower rock formations, where ore in commercial quantities was found, and in 1961 sank a new shaft on the property. ASARCO invested substantial amounts in the exploration, development, and equipping of the Galena mining property.

As of April 30, 1958, Vulcan was merged into petitioner, with the result that petitioner again became the owner of the Galena mining property, subject to the agreement.

---

[3] On Apr. 2, 1947, however, ASARCO assigned one-quarter of its interest to Fern Mining Co., which interest was subsequently assigned to Day Mines, Inc., its present owner. This assignment has no bearing on the issues involved herein.

From 1953 to 1959, ASARCO made payments to Vulcan or petitioner, in accordance with article 11 of the agreement, in the following annual amounts:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1953 | $46, 940 | 1957 | $378, 040 |
| 1954 | 92, 738 | 1958 | 424, 107 |
| 1955 | 176, 466 | 1959 | 95, 229 |
| 1956 | 274, 073 | | |
| | | Total | $1, 487, 593 |

For Federal income tax purposes, Vulcan and petitioner reported these payments as its depletable income, and ASARCO, until it had been fully reimbursed for all prior advances, reported the gross income from the property, less the payments, as its depletable income.

ASARCO's unreimbursed expenditures for the operation of the Galena mining property reached $3,641,079 by December 31, 1954. After that date, the operation began to show a profit and reimbursements to ASARCO began.

By January 1959, sufficient net profits had been generated from the operation of the Galena mining property to reimburse ASARCO for all its prior expenditures, including amounts paid by it to Vulcan or petitioner, and to establish working capital of $500,000 (hereinafter referred to as the "working capital account"), pursuant to article 14 of the agreement. While this working capital account was being established in 1958 and 1959, petitioner continued to receive payments under article 11 of the agreement, which payments were deducted in determining net profits. Since the establishment of the working capital account in 1959 and during all years here in issue, petitioner and ASARCO have divided net profits equally.

The working capital account is represented by inventories, supplies, accounts receivable, and other current assets readily convertible into cash and needed in the operation of the property.

In 1958 and 1959, the parties to the agreement treated the $500,000 working capital account for Federal income tax purposes as follows: ASARCO included in its gross income, and claimed depletion for 75 percent of, $250,000. Neither petitioner nor ASARCO included in gross income, or claimed depletion on, the other $250,000.[4]

During late 1959 and early 1960, the smelters serving the Galena mines went on strike, thus causing ASARCO to make additional advances of approximately $800,000 over and above the $500,000 working capital account previously established. These advances were subsequently recovered by ASARCO from future net profits.[5]

---

[4] Day Mines, Inc., included in its gross income, and claimed depletion on, 25 percent of the full $500,000. See fn. 3, *supra*.

[5] Such advances bore no interest, because they only served to increase working capital. Under article 17 of the agreement, advances bore interest only if made for capital acquisitions or improvements or only if the working capital was exhausted and current profits were insufficient.

Petitioner received net profit payments from ASARCO pursuant to the agreement in the following annual amounts:

| Year | Amount |
|------|--------|
| 1959 | [1] $534,501 |
| 1960 | 586,048 |
| 1961 | 838,778 |

[1] Also in 1959, petitioner received $95,229 from ASARCO under article 11 of the agreement.

Petitioner's published financial statements for 1959, 1960, and 1961 showed as income from the Galena mining property only the amounts actually received from ASARCO. In its annual reports for 1959 and 1960, petitioner characterized its interest in the Galena mining property as "essentially 50 percent of the operating cash flow from the operation."

On its Federal income tax returns for the years 1959, 1960, and 1961, petitioner computed and claimed percentage depletion deductions on the Galena mining property as follows:

| Year | Gross income from sales | Amounts applied to working capital and capital expenditures | Gross income adjusted as claimed by petitioner | Petitioner's claimed share (50%) | Petitioner's claimed depletion (15%) |
|------|------|------|------|------|------|
| 1959 | $3,236,841 | ($63,324) | $3,173,517 | $1,586,758 | $238,013 |
| 1960 | 3,423,857 | (79,555) | 3,344,302 | 1,672,151 | 250,822 |
| 1961 | 4,568,077 | (1,551) | 4,566,526 | 2,283,263 | 342,489 |

Respondent, in his notice of deficiency herein, determined that petitioner was entitled to depletion deductions based on 15 percent of the amounts actually received by petitioner from ASARCO, i.e., $618,730 in 1959, $586,047 in 1960, and $838,778 in 1961.

On its Federal income tax returns for the years 1959, 1960, and 1961, ASARCO included in gross income, and claimed depletion at the rate of 15 percent on, the total gross income from the Galena mining property, less payments made to petitioner and $250,000 of the working capital account accumulated in 1958 and 1959. Respondent subsequently disallowed depletion claimed by ASARCO to the extent that such depletion, when added to the depletion claimed by petitioner, would exceed 15 percent of the total gross income from the Galena mining property.[6]

Neither petitioner nor ASARCO has ever filed joint venture or partnership income tax returns with reference to the Galena operations.

Pursuant to section 63–2801 et seq. of the Idaho Code, the State of Idaho levies an annual personal property tax measured by the annual

[6] There is no evidence in the record herein indicating whether ASARCO made any claim with respect to this action by respondent, or, if it did, what disposition was made thereof.

net profits of mining ventures (hereinafter referred to as the net profits tax).

In years prior to 1958, Vulcan was billed directly by the State of Idaho for, and paid a portion of, the net profits tax of the Galena operation, measured by the amount of annual payments it received from ASARCO; ASARCO paid the balance and included such balance in reimbursable expense in computing "net profits" under article 15 of the agreement. Vulcan claimed that this resulted in an inequitable burden on it, in that it was bearing both 100 percent of the taxes it had paid and 50 percent of the taxes paid by ASARCO. In 1957, through negotiation and correspondence between the parties, it was agreed that 100 percent of the Idaho net profits tax should be a charge against the Galena operations and thus borne equally by Vulcan and ASARCO.

For the years 1959, 1960, and 1961, the net profits taxes levied by the State of Idaho on the Galena operation amounted to $98,472, $93,971, and $156,523, respectively, which taxes were paid by ASARCO and deducted in computing the "net profits" from the property in which petitioner was entitled to share.

On its Federal income tax returns for the years 1959, 1960, and 1961, petitioner included in its gross income a 50-percent share of the amount expended for the Idaho net profits tax and took depletion thereon.

#### OPINION

The principal issue herein is *the measure* of the amount upon which petitioner is entitled to compute percentage depletion for the taxable years 1959, 1960, and 1961 with respect to the Galena mining property. There is no question that petitioner's "net profits" share in the gross income from the property constitutes an economic interest sufficient to support such a deduction. *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U.S. 25 (1946); *Kirby Petroleum Co.* v. *Commissioner*, 326 U.S. 599 (1946). The governing statutory provisions are sections 611(a) and 611(b)(1) of the Internal Revenue Code of 1954.[7]

Petitioner maintains that under "the peculiar conditions" of this case (sec. 611(a)) and in order to reflect an "equitable" apportionment as required by section 611(b)(1), it should include 50 percent of the

---

[7] SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION.

(a) GENERAL RULE.—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. * * *

(b) SPECIAL RULES.—

(1) LEASES.—In the case of a lease, the deduction under this section shall be equitably apportioned between the lessor and lessee.

*total gross income* from the property in its gross income and compute its depletion deduction thereon.[8] Respondent, on the other hand (and ASARCO, which filed briefs *amicus curiae*) contends that the proper amount to be included in petitioner's gross income and upon which the depletion deduction should be computed is 50 percent of the *net profits* from the property, i.e., the amounts actually received from ASARCO. We agree with respondent.

Petitioner contends that, at least at the point of time in 1959 when the $500,000 working capital fund had been accumulated, it and ASARCO, for all practical purposes, had an equal stake in the success or failure of the Galena mining property, each item of income, expense, and capital expenditure being attributable to and/or borne equally by the two parties. It urges that, during the period involved herein, ASARCO was no more at risk than petitioner because of the proven profitability of the property, the working capital account, and ASARCO's right to terminate the lease at any time. It is thus urged that petitioner and ASARCO were, *in effect*, "equal co-venturers" during the years in question[9] and should divide the depletion allowance equally in those years.

Petitioner recognizes that, aside from the aforementioned potential inclusion of additional amounts in prior years (see fn. 8, *supra*), it properly included in its gross income, and used as the base for computing depletion, only the amounts which it actually received from ASARCO during the recoupment period. *United States* v. *Cocke*, 399 F. 2d 433 (C.A. 5, 1968), overruling en banc *Commissioner* v. *J. S. Abercrombie Co.*, 162 F. 2d 338 (C.A. 5, 1947), affirming 7 T.C. 120 (1946), and *Prater* v. *Commissioner*, 273 F. 2d 124 (C.A. 5, 1959), reversing 30 T.C. 1262 (1958); *United States* v. *Thomas*, 329 F. 2d 119 (C.A. 9, 1964), an en banc decision overruling *Helvering* v. *Armstrong*, 69 F. 2d 370 (C.A. 9, 1934);[10] *Manahan Oil Co.*, 8 T.C. 1159 (1947); see *Byron H. Farwell*, 35 T.C. 454, 468 (1960), in which *Abercrombie* and *Prater* were distinguished and severely limited in their application. Petitioner asserts, however, that these decisions are

---

[8] Petitioner recognizes that the logic of its position might require the conclusion that, during the pre-1959 period, it should have included in its gross income, and taken depletion on, 50 percent of amounts of gross income from the Galena mining property which was used to reimburse ASARCO for capital outlays and to establish the working capital fund. For reasons which will subsequently appear, we find it unnecessary to delve into the issues which inhere in this problem.

[9] Despite petitioner's use of such phrases to "co-venturer" and "co-partner" at the trial and in the briefs, it does not maintain (and, indeed, we do not think it could have so maintained) that a joint venture or partnership, as those relationships have been legally defined, actually existed in the instant case. E.g., *Grandview Mines* v. *Commissioner*, 282 F. 2d 700 (C.A. 9, 1960), affirming 32 T.C. 759 (1959).

[10] The same transaction involved in this case was also the subject of a decision in favor of the lessor in *Reynolds* v. *McMurray*, 60 F. 2d 843 (C.A. 10, 1932). Although not technically overruled, the *McMurray* case was made moribund by *Cocke* and *Thomas*.

not determinative of the proper allocation of gross income from the property during the postrecoupment period and that, in the context of this case, *Abercrombie, Prater, Armstrong*, and *McMurray* (see fn. 10, *supra*) retain their vitality and support petitioner's contention that the existence of personal liability on the part of the lessor for its share of the ongoing costs and expenses of the operation is not the touchstone of decision.

We think that petitioner's view is myopic. The totality of petitioner's relationship with ASARCO must be considered, not simply the actual results during any one period of operation. Cf. *United States* v. *White*, 401 F. 2d 610 (C.A. 10, 1968). Looked at in this ken, petitioner and ASARCO were not on as equal a footing as petitioner would like us to believe.

It is clear from the agreement—and petitioner does not contend otherwise—that ASARCO had all the operating rights and duties in the Galena mining property, including the right to extract and dispose of the minerals therefrom. With respect to liability for costs or expenses of production, ASARCO was obligated to furnish, in the first instance, all capital for exploration, development, and operation of the property. Under the agreement, it could look only to the net profits from production for reimbursement of these outlays. After the property reached a profitable stage, while petitioner admittedly shared costs and expenses to the extent of its interest in net profits, it was under no personal obligation to contribute to or bear any portion of such costs and expenses. Granted that *United States* v. *Cooke, supra*, and *United States* v. *Thomas, supra*, did not necessarily decide that the absence of personal liability was the determining factor, the fact remains that the courts continue to regard personal liability as an important factor in the allocation of the depletion allowance. *United States* v. *Thomas*, 329 F. 2d at 130; cf. *Weinert's Estate* v. *Commissioner*, 294 F. 2d 750 (1961), reversing and remanding on other grounds 31 T.C. 918, 928 (1959) ; *Manahan Oil Co., supra.*[11]

Petitioner itself recognizes that the personal liability element is significant but contends it should be denigrated in this case because of the existence of the $500,000 working capital fund. Petitioner's syllogism proceeds along the following lines: (a) If there had not been a provision for the establishment of such fund, it would have received "net profit" payments of $250,000; (b) one-half of the working capital fund was consequently represented by its money; (c) the fund assured ASARCO of the means to operate the property under normal

---

[11] See Caplan, "Taxation of Carried Interests: A Study in Gossamer Distinctions," 7 S. Tex. L.J. 239, 265 (1964).

circumstances and provided a reserve against future losses; (d) therefore, during the period in question, it shared equally with ASARCO in the financial burdens and risks. We reject this deductive logic. Concededly, if there had not been such a provision, petitioner would have received additional net profits and would have been entitled to a larger deduction for depletion, i.e., on the larger amount received. But it does not follow that the establishment of that fund thereafter enlarges petitioner's base for depletion into a greater amount of income which it did not receive. The fact is that, even assuming that one-half of the working capital fund belonged to petitioner during the operations of the Galena mining property (an issue which we do not decide, see p. 1021, *infra*), whatever risk it had was limited to profits generated by the venture.

ASARCO, on the other hand, was still faced with the likelihood that it would have to put up funds beyond its share of the profits from the venture in order to keep the operations going. Indeed, as late as 1959 and 1960, a smelter strike necessitated ASARCO's putting up approximately $800,000. Granted that ASARCO subsequently recovered these outlays from net profits, it was ASARCO, and ASARCO alone, which bore the risk that such profits might never materialize. What is even more significant is that, at the very moment in 1959 when operations turned the corner and petitioner was scheduled to move from 50 cents per ton to a "net profits" payment, article 17 of the agreement was amended to provide that petitioner should receive 50 cents a ton in any calendar quarter when the net profits from operations fell below this amount.[12]

Nor are we impressed with petitioner's argument that, because ASARCO had the right to terminate the agreement, the existence of the working capital fund during the period in question gave ASARCO the capability to "pull the plug" and come out whole, thereby minimizing ASARCO's risk. A termination clause is not uncommon in leases of the type involved herein, and there has been no indication that the courts attach any significance thereto. E.g., *United States* v. *Thomas*, *supra*.

In short, even in the years at issue, ASARCO, and not petitioner, bore the ultimate risk of nonprofitability. The working capital fund at best provides the roof for a depletion structure from which the

---

[12] Petitioner attached to a supplemental brief a voucher of ASARCO which showed that the property had losses during the last two quarters of 1960. During this period, mining operations were at a standstill because of a strike, so that the provision for a guaranteed minimum payment was not operative. But neither was petitioner called upon to make good its share of those losses. Rather, they were deducted from petitioner's share of net profits for the first quarter of 1961.

foundation and walls are missing.[13] Under the circumstances of this case, we conclude that an allocation of the depletion deduction to petitioner based upon the amounts it actually received best satisfies the mandate of equitable apportionment under section 611(b)(1). We are reinforced in our conclusion by the fact that every decision which retains its vitality and which has considered the question has concluded that, even in the postrecoupment period, the holder of a net profit interest is entitled to depletion only on the *amounts he receives,* and not on a percentage of gross income. *United States* v. *Thomas, supra; Grandview Mines* v. *Commissioner,* 282 F. 2d 700 (C.A. 9, 1960), affirming 32 T.C. 759 (1959); *Commissioner* v. *Felix Oil Co.,* 144 F. 2d 276 (C.A. 9, 1944), affirming a Memorandum Opinion of this Court; *Byron H. Farwell, supra; Marrs McLean,* 41 B.T.A. 565 (1940). Our conclusion was also foreshadowed by *Kirby Petroleum Co.* v. *Commissioner, supra,* where the Supreme Court, in deciding that a share in net profits constituted an "economic interest" sufficient to support a depletion allowance, stated (326 U.S. at 604): "We think these taxpayers had an economic interest in the oil, sufficient to support depletion *on the sums received as net profit.*" (Emphasis added.)

Petitioner seeks to avoid the impact of these decisions by constructing distinctions based upon the existence therein of a "carried" or "royalty" as distinguished from a "net profits" interest and upon the proposition that a coownership rather than a lessor-lessee relationship was involved. Whatever may be the ramifications of these distinctions in another context, they are not applicable to the circumstances of this case. Compare *Kirby Petroleum Co.* v. *Commissioner,* 326 U.S. at 604–606; *Byron H. Farwell,* 35 T.C. at 468; Hambrick, "Another Look at Some Old Problems—Percentage Depletion and the ABC Transaction," 34 Geo. Wash. L. Rev. 1 (1966).

The depletion allowance manifests a congressional intent to encourage the discovery and development of new resources and to grant concessions to those who risk their capital in that pursuit. See 65 Cong. Rec. 2799 (1924); H. Rept. No. 1, 69th Cong., 1st Sess., p. 6 (1926). We think this intent is more fully effectuated by the allocation of

---

[13] In *United States* v. *Thomas,* 329 F. 2d 119, 128 (C.A. 9, 1964), the parties provided for a $25,000 "reserve operating fund" to be established from the "net proceeds" from operations, which fund is analogous to the working capital account herein, but the court gave no weight to that factor in assessing the economic realities of the arrangement. Petitioner seeks to strengthen its argument as to the working capital fund by speculating that, if and when its share of that fund is paid to it at a later date, it may not be entitled to the full benefit of depletion thereon because of insufficient net profits from the operations in the year of payment. We need not join in the speculation since the problem is not now before us. Suffice it to say that the mere possibility of future difficulties cannot justify departure from a clearly indicated conclusion herein. Similar considerations are involved with respect to the proper treatment if and when petitioner receives its share of amounts expended for capital outlays for equipment, etc. Cf. sec. 109.

the depletion allowance as urged by respondent, since it is ASARCO, and not petitioner, who supplied the capital and bore the risk of the Galena operation. We are not persuaded that we should accept petitioner's contention that there was a sufficient sharing of costs and expenses (see *United States* v. *Cocke*, 399 F. 2d at 436) at the end of the recoupment period to justify the adoption of a "shifting use" concept in determining petitioner's base for computing depletion.

We therefore hold that petitioner should compute its depletion deduction based on 15 percent of the amounts actually received by it from ASARCO as net profits during the years in issue. In so holding, we inter our decision in *Abercrombie* as the Fifth Circuit Court of Appeals has done with its prior affirmance of that decision. *United States* v. *Cocke, supra.*

The parties have agreed that, in the event of such a holding, petitioner will not be considered as having received, in the pre-1959 period, any portion of the net profits which were used to accumulate the $500,000 working capital fund.[14] As a result, petitioner is not required to increase its net income for 1958 to reflect such portion. This agreement, coupled with a concession by respondent with respect to petitioner's dividend received deduction for 1958, disposes of the issue involving the amount of the petitioner's loss carry forward from that year.

We turn now to the final issue which requires decision, namely, to what extent is the petitioner entitled to include in its gross income, and take depletion on, the Idaho net profits tax paid by ASARCO and charged against the income from the operation of the Galena mining property pursuant to the agreement in the years in question? The parties are in agreement that resolution of this issue turns upon the extent of petitioner's liability under State law for the tax involved and that the fact that ASARCO paid the tax is not determinative. If a lessor of mineral interests is so liable, the payment by the lessee pursuant to the terms of the lease agreement is considered a defrayal of the lessor's obligation; the amount paid (whether by way of a fixed payment per ton or a percentage of net profits) constitutes additional amounts paid to the lessor and is includable in the lessor's, and not the lessee's, gross income subject to depletion. *Louisiana Land & Exploration Company* v. *Donnelly*, 394 F. 2d 273 (C.A. 5, 1968) (Louisiana); *Handelman* v. *United States*, 357 F. 2d 694 (Ct. Cl. 1966) (Minnesota); *Burt* v. *United States*, 170 F. Supp. 953 (Ct. Cl. 1959) (Minnesota); *Winifred E. Higgins*, 33 T.C. 161 (1959) (State not apparent); *United States Steel Corporation* v. *United States*, 270 F. Supp. 253

---

[14] No issue has been raised as to the separate treatment of amounts expended for capital outlays during the pre-1959 period or the years in issue herein. See fn. 8, *supra.*

(S.D.N.Y. 1967) (Minnesota). In all of these cases, the courts found that the lessor was liable for the entire State tax and determined the right to depletion accordingly. Petitioner herein has not claimed that it had liability for more than one-half of the Idaho net profits tax and we therefore confine our attention to that claim and proceed to consider the applicable Idaho law.

Section 63–2801 of the Idaho Code imposes a tax on "the net annual proceeds of all mines and mining claims." It appears, and the parties do not argue otherwise, that "net annual proceeds" are equated with "net profits," which phrase is defined in section 63–2802.[15] Pursuant to the provisions of section 63–2803, "Every person, corporation or association engaged in mining" is required to file an annual "statement of the net profits derived from the mining of said metals or minerals, from each mine or mining claim owned or worked by such person." The tax is collected by assessment of the county assessor (secs. 63–2808, 63–2809, and 63–2710) and every such tax is a lien upon the mine or mining claim from which the ores or minerals are extracted.

The Idaho tax has been described as a *property tax* on the several minerals, with the net profits simply being the base upon which the tax is imposed. Op. Atty. Gen. Idaho (Nov. 18, 1957). This position is supported by the facts that the determination of net profits permits the deduction only of the costs directly involved in extraction (sec. 68–2802), that the rate of tax is not specified as is usually the case with an income or profits tax, that the tax is assessed and is made subject to equalization in the manner as provided "for the assessment of other property" (sec. 63–2810), and that the "tax is made a lien on the property" (sec. 63–2811).

Although the responsibility for filing a statement of net profits appears to rest with the mining operator under section 63–2803, we are convinced that the reporting requirement and liability for the tax are not necessarily coextensive. We are reinforced in this conclusion by the fact that, prior to the agreement between ASARCO and

---

[15] 63–2802. Net profits defined.—The term "net profits," as employed in this chapter, means the amount of money received from the mining of said metals or minerals from said mine or mining claim, after the deduction of the actual expenditure of money and labor in and about extracting the metals and minerals from the mine or mining claim, and transporting the same to the mill, concentrator or reduction works, and the reduction thereof, and the conversion of the same into money, or its equivalent, and also the deduction of all moneys expended for necessary labor, machinery and supplies needed and used in the mining operations, for the improvements necessary in and about the mine or mining claim, for reducing ores, for the construction of the mills and reduction works used and operated in connection with the mine or mining claim, for transporting the ore, and for extracting the metals and minerals therefrom; but the money invested in the mine, or improvements made during any year except the year immediately preceding such statement, must not be included therein. Such expenditures do not include the salaries, or any portion thereof, of any person or officers not actually engaged in the working of the mine, or personally superintending the management thereof.

petitioner in 1957 regarding ASARCO's payment of the full amount of the tax subject to the inclusion of this payment in the net profit computation, the State of Idaho assessed the tax against both petitioner and ASARCO to the extent of their respective interests in the profits of the venture.[16] Moreover, if the tax were assessed against only one party to the venture, without regard to its right to retain the profits upon which the tax is based, the tax levied could exceed that party's actual share of net profits. Such a view of the incidence of the net profits tax could produce an absurd result.

While we, unfortunately, do not have the benefit of any decided cases on the extent of a lessor's liability for the Idaho net profits tax, we are satisfied that the highest court of Idaho would hold that petitioner's ownership in the several minerals for the purposes of the Idaho net profits tax would be the same as its entitlement to net profits under the agreement, i.e., 50 percent, and that petitioner was therefore liable for the tax on its share of those profits used by ASARCO to pay such tax. *Commissioner* v. *Estate of Bosch*, 387 U.S. 456 (1967). Accordingly, under the authority of the cases previously cited (see p. 1021, *supra*), we hold that ASARCO's payment of petitioner's share of that tax pursuant to the agreement is includable in petitioner's gross income subject to depletion.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

[16] Since 1955, the Galena operation has produced profits subject to the Idaho tax. However, because in the years 1955, 1956, and 1957 the prerequisites to the 50–50 splitting of net profits as provided in article 14 had not been met, petitioner instead received payments pursuant to article 11. These payments were used in the basis of the assessment of the net profits tax against petitioner.